02-09-182-CR
















 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO. 2-09-00182-CR

 

 


 
 
 ALEJANDRO ORONA
 
 
  
 
 
 APPELLANT
 
 


 

V.

 


 
 
 THE
 STATE OF TEXAS
 
 
  
 
 
 STATE
 
 


 

 

------------

 

FROM THE 396TH
 DISTRICT COURT OF TARRANT
COUNTY

 

------------

 

OPINION

 

------------

I.  Introduction

A jury found Appellant Alejandro Orona guilty of murder and assessed his punishment at life
imprisonment.  The trial court sentenced him
accordingly.  In eight points, Orona argues that insufficient evidence exists to sustain
his conviction and that the trial court erred by not submitting jury charges on
lesser offenses and by admitting hearsay in violation of Orona’s
federal and state constitutional rights to cross-examination.  We will affirm.








II.  Factual and Procedural Background

Scott Sartain was a methamphetamine user
and an insulin-dependent diabetic.  He stole
his grandmother’s checkbook, forged a check, and got his friend Natalie Bazan to cash it. 
The bank confirmed that the check was forged, and police arrested Bazan.  Bazan’s husband, Brian Johns, was upset about Bazan’s arrest, and after Johns bailed her out of jail, the
two confronted Sartain at Orona and Kelly Munn’s house,
where Sartain was staying at the time.

Johns and Bazan
found Sartain in a back room with Munn and confronted him.  Johns and Bazan
both hit Sartain, and when Sartain started to leave, Munn “just started jumping
on him.”  Orona
came into the room and joined in the beating, kicking and hitting Sartain.  Munn said, “Go to sleep, bitch,” while hitting
Sartain.  Sartain covered his head and
was knocked to the ground.  Bazan and some of the other people at the house yelled for Orona and Munn to stop, but they continued kicking and
hitting Sartain.  Bazan,
Johns, and the other people in the house fled as the beating continued.

Melissa Morante—who
had fled the house during the fight—returned the following day.  Orona and Munn were
playing loud music, and Morante could hear moans
coming from the garage.  Munn and Orona had blood on their shoes.  Both told Morante
that Sartain was in the garage.  Rebecca Brauer, who had heard about the beating, also went to Orona and Munn’s house a few days after the fight.  In front of Brauer,
Munn told Orona that he needed to feed and water the “dog”
and pointed toward the garage.  Daniel
Osborne, a friend of Munn’s, went to the house after the fight, and Munn told Osborne
that he and Orona had beaten Sartain because he owed them
money; Munn asked Osborne to check on Sartain in the garage, but Osborne did
not because he “didn’t want to believe it.”

Days after the fight, Munn called Johns and
asked him to bring over some Fabuloso floor cleaner.  When Johns arrived, the house smelled like “rotten
garbage” and was freezing inside.  He
noticed that dryer sheets had been placed in all of the air-conditioning
vents.  Orona
and Munn came out of a back room, and Johns could see a hacksaw and knives on a
table in that room.  He saw Munn hold up Sartain’s severed head.  Johns ran out of the house and to a nearby
motel to tell friends what he had seen.

Osborne returned
to Munn and Orona’s house a second time and noticed
that it “smelled like hot garbage and nasty meat.”  Munn and Orona were
cleaning the house—mopping with Fabuloso cleaner and
taking out the trash.  Munn and Orona had rubbed Vicks vapor rub over their noses.  Munn told Osborne that they had cut up Sartain’s body, and Munn asked for Osborne’s help disposing
of it.  Osborne refused, but he later
helped them load Sartain’s car and a bathtub full of
trash bags and brush onto a trailer.  Some
acquaintances of Munn and Orona’s drove the trailer to
a rural area near Waco, where more acquaintances cut up Sartain’s
car for scrap metal and burned the trash bags.

Police got a tip about a murder a few
months later.  They eventually tracked
down witnesses.  Sartain’s
body was never found.  Approximately
seven months after the beating, police searched Orona
and Munn’s house for evidence of a murder. 
Orona and Munn no longer lived there.  Police applied a chemical that can detect blood
to the walls and floors.  Although it
showed some areas that could have blood on them, police were unable to remove
those areas for further testing before the chemicals destroyed the potential
DNA samples.  DNA samples that the police
took from baseboards in the house did not test positive for Sartain’s
blood.

III.  Sufficiency of the Evidence

In his fifth and
seventh points, Orona complains about the legal sufficiency
of the evidence.  In his sixth and eighth
points, Orona complains about the factual sufficiency
of the evidence.  Because the Texas Court
of Criminal Appeals recently held in Brooks
v. State, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010), that there is no
meaningful distinction between the factual sufficiency standard and the legal
sufficiency standard, we analyze Orona’s insufficiency
arguments under only the legal sufficiency standard.

A. 
Legal Sufficiency Standard of Review

In reviewing the legal sufficiency of the evidence to support
a conviction, we view all of the evidence in the light most favorable to the
prosecution in order to determine whether any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full
play to the responsibility of the trier of fact to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts.  Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton,
235 S.W.3d at 778.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See Tex. Code Crim.
Proc. Ann. art. 38.04 (Vernon 1979); Brown v. State, 270 S.W.3d
564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 2075
(2009).  Thus, when performing a legal
sufficiency review, we may not re-evaluate the weight and credibility of the
evidence and substitute our judgment for that of the factfinder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  Instead, we Adetermine whether the
necessary inferences are reasonable based upon the combined and cumulative
force of all the evidence when viewed in the light most favorable to the
verdict.@  Hooper
v. State, 214 S.W.3d 9, 16B17 (Tex. Crim. App. 2007).  We must presume that the factfinder
resolved any conflicting inferences in favor of the prosecution and defer to
that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.

The standard of review is
the same for direct and circumstantial evidence cases; circumstantial evidence
is as probative as direct evidence in establishing the guilt of an actor.  Clayton, 235 S.W.3d
at 778; Hooper, 214 S.W.3d at 13. 
In determining the legal sufficiency of the evidence to show an
appellant=s intent, and faced with a record that supports conflicting
inferences, we Amust presume—even if it does not
affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of
the prosecution, and must defer to that resolution.@  Matson v. State, 819
S.W.2d 839, 846 (Tex. Crim. App. 1991).

B.  Sufficiency of Evidence to Prove Murder

In his fifth and
sixth points, Orona argues that the evidence is
insufficient to prove that Sartain is deceased or to prove the cause of his
death.  Specifically, he argues that Sartain’s body was never found, that no witness testified
to seeing Sartain’s murder,
and that the evidence suggests that Sartain “is hiding from his family, his
enemies, or the law.”

A person commits
the offense of murder if he intentionally or knowingly causes the death of an
individual.  Tex. Penal Code Ann. §
19.02(b)(1) (Vernon 2003); Hall v. State, 137 S.W.3d 847, 852 (Tex. App.—­Houston [1st Dist.]
2004, pet. ref’d). 
A person acts “intentionally,” or with intent, with respect to the
nature of his conduct or to a result of his conduct when it is his conscious
objective or desire to engage in the conduct or cause the result.  Tex. Penal Code Ann.         § 6.03(a) (Vernon 2003).  A person acts “knowingly,” or with knowledge,
with respect to a result of his conduct when he is aware that his conduct is
reasonably certain to cause the result.  Id. § 6.03(b).

In a homicide
case, the State is not required to produce a body.  See Fisher v. State, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993) (“[P]roduction and identification of the victim’s body or
remains is not part of the corpus delicti of murder.”).  The State must show the death of the victim
caused by the criminal act of the defendant. 
McDuff v. State, 939 S.W.2d
607, 614 (Tex. Crim. App. 1997).

In this case, the
jury charge included, and the indictment alleged, several manners and means by
which Orona murdered Sartain:  by a manner and means unknown to the grand
jury, or 

by
kicking [Sartain] with his feet or by punching him with his hands or by
preventing [him] from obtaining insulin in sufficient quantities to prevent his
death when [Orona] knew that . . . Sartain was an
insulin-dependent diabetic, or by a combination of any or all of the
aforementioned means.

 

The
evidence demonstrates that Orona and Munn kicked and
punched Sartain, continued to do so despite the pleas of others in the house to
stop, and put Sartain in their garage after beating him.  Two witnesses testified that Orona had blood on his shoes after the incident.  Morante testified
that the day after the fight, she heard moans coming from the garage over the
sound of loud music and that both Munn and Orona told
her that Sartain was in the garage.  Brauer testified that she heard Munn tell Orona to feed and water “the dog” as he pointed to the
garage.  Munn told Osborne that Sartain
owed him and Orona money and that they beat Sartain and
put him in the garage.

During oral
argument to this court, Orona’s appellate counsel
admitted that evidence shows that Sartain was severely beaten, but he argued
that no evidence shows that Sartain is now deceased.  To the contrary, evidence exists that Sartain
died at some point after the beating and that Munn and Orona
disposed of his body with the help of their friends.  Munn told Osborne, in front of Orona, that Sartain had died “during [Orona’s]
shift of watching him” and that Munn knew Sartain was an insulin-dependent diabetic
and was trying to find him insulin.  Sartain
required at least two insulin shots daily, and he often stayed with people who
had refrigerators so that he could store his insulin.  His diabetes was so severe that, without
insulin, he could go into a diabetic coma and die within twenty-four hours;
physical injuries could also exacerbate his diabetes.

Several witnesses
described a foul odor at the house days after the beating and saw Orona and Munn cleaning with Fabuloso
cleaner.  Orona
and Munn turned down the air conditioner, put dryer sheets over the air-conditioning
vents, and rubbed Vick’s vapor rub on their noses.  Johns saw Munn hold up Sartain’s
severed head, and another witness testified that Munn said he and Orona had cut up Sartain’s body.  Witnesses testified that Munn and Orona had
acquaintances haul Sartain’s car and a bathtub full
of trash bags to a rural area to be burned and disposed of.  After the beating, none of Sartain’s family and friends ever heard from him again; Sartain’s cell phone records show that his phone was
disconnected for lack of payment two months after the beating.  Sartain’s mother
testified that, after the forgery incident, she told Sartain that she never
wanted to see him again.  But she also explained
that he was very close with his grandmother and would go to her house for lunch
or dinner almost daily although he had not attempted to contact her since the
check-forgery incident.

Orona also argues that insufficient evidence exists to show
that he knew that Sartain was an insulin-dependent diabetic; consequently, Orona argues that he could not have intentionally or
knowingly caused Sartain’s death by preventing him
from obtaining insulin in sufficient quantities to prevent his death.  When, as here, a jury returns a guilty verdict
on an indictment charging several alternate manners and means, the verdict
stands if the evidence is sufficient with respect to any of the acts charged.  See Kitchens
v. State, 823 S.W.2d 256­­, 259 (Tex. Crim. App. 1991), cert. denied, 504 U.S. 958 (1992); Burnett v. State, 842 S.W.2d 296,
299–300 (Tex. App.—Fort Worth 1992, pet. ref’d).  Not only was there evidence tending to show
that Orona knew that Sartain was an insulin-dependent
diabetic and that Orona deprived him of insulin, but
evidence existed to show that Sartain’s death was
caused by Orona’s kicking or punching him or by a
combination of any or all of the alleged manners and means.[1]  See
Burnett, 842 S.W.2d at 300.

Viewing the
evidence in the light most favorable to the jury’s verdict, we hold that a
rational trier of fact could have found beyond a reasonable doubt that Sartain
is not hiding but is, in fact, deceased and that Orona
caused Sartain’s death by one, or a combination, of
the manners and means alleged in the indictment, that is, by kicking Sartain,
punching him, depriving him of insulin when Orona
knew he needed it to survive, or a combination of these manners and means.  See
Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778. 
Accordingly, we hold that the evidence is legally sufficient to support Orona’s conviction. 
We overrule Orona’s fifth and sixth points.

C.  Deadly
Weapon Finding

In his seventh and eighth points, Orona argues that the evidence is insufficient to prove that
he used a deadly weapon.  However, the
jury was not asked to make a deadly weapon finding, and the trial court did not
enter a deadly weapon finding in the judgment.  Consequently, we overrule Orona’s
seventh and eighth points.

IV.  Jury Charge

The jury was
charged with murder and the lesser-included offenses of manslaughter and aggravated
assault, but the trial court denied Orona’s requests
that the jury charge include charges on criminally negligent homicide and
assault causing bodily injury.  Orona argues in his first and second points that the trial
court erred by not including charges on criminally negligent homicide and
assault causing bodily injury.

A.   
Standard
of Review and

Law on
Lesser-Included-Offense Instructions

 

Appellate review of error in a jury charge involves a
two-step process.  Abdnor v. State, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); see also Sakil v.
State, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).  Initially, we must determine whether error
occurred.  If so, we must then evaluate
whether sufficient harm resulted from the error to require reversal.  Abdnor, 871 S.W.2d
at 731–32.

A defendant is
entitled to an instruction on a lesser offense if (1) the lesser offense is a
lesser-included offense of the charged offense and (2) there is some evidence
in the record that would permit a jury rationally to find that if the defendant
is guilty, he is guilty only of the lesser offense.  Guzman v. State, 188 S.W.3d 185, 188 (Tex. Crim. App. 2006).
 We must review all evidence presented at
trial to make this determination.  Lugo v. State, 667 S.W.2d
144, 147 (Tex. Crim. App. 1984).  In
reviewing the second prong of this test, there must be some evidence from which
a rational jury could acquit the defendant of the greater offense while
convicting him of the lesser-included offense. 
Moore v. State,
969 S.W.2d 4, 8 (Tex. Crim. App. 1998). 
The evidence must establish the lesser-included offense as a valid
rational alternative to the charged offense.  Wesbrook v. State,
29 S.W.3d 103, 113–14 (Tex. Crim. App. 2000), cert. denied, 532 U.S. 944 (2001).

B.  Requested Charge on Assault Causing Bodily
Injury

A person commits
assault by intentionally, knowingly, or recklessly causing bodily injury to
another.  See Tex. Penal Code Ann. § 22.01(a)(1)
(Vernon Supp. 2010).  The assault becomes
an aggravated assault if the person uses or exhibits a deadly weapon.  Id.
§ 22.02(a)(2) (Vernon Supp. 2010).  A deadly weapon means “anything that in the
manner of its use or intended use is capable of causing death or serious bodily
injury.”  Id. § 1.07(a)(17)(B) (Vernon Supp. 2010).

In this case,
because simple assault is included within the proof required to establish the aggravated
assault charged, Orona was entitled to a charge on
assault causing bodily injury if some evidence in the record would permit a
jury rationally to find that Orona did not use or
exhibit a deadly weapon.  See Guzman, 188 S.W.3d at 188; Lugo,
667 S.W.2d at 147; Jones v. State,
241 S.W.3d 666, 671 (Tex. App.—Texarkana 2007, no pet.).  The question becomes whether there is
evidence in the record that would permit a rational finding that Orona beat Sartain with his hands or feet but that he did
not use or intend to use his hands or feet in a manner capable of causing death
or serious bodily injury.  See Tex. Penal Code Ann. § 1.07(a)(17)(B). 

Orona argues that he was entitled to such a charge because
Dr. Lloyd White testified generally that hands and feet could be used in an
assaultive manner while not constituting deadly weapons.  However, this generalized testimony is not
some evidence to show that, in this case, Orona did
not use his hands and feet as deadly weapons. 
It is well established that hands and feet can be deadly weapons, and
nothing in the record suggests that Orona did not
intend to use his hands or feet in a manner capable of causing death or serious
bodily injury.  See, e.g., Lane v. State,
151 S.W.3d 188, 192 (Tex. Crim. App. 2004) (holding that hands can be deadly
weapons); Powell v. State, 939 S.W.2d
713, 717 (Tex. App.—El Paso 1997, no pet.) (holding that feet can be deadly
weapons).  The evidence shows that Orona and Munn severely beat Sartain by repeatedly hitting
and kicking him, even after Sartain fell to the floor.  They continued hitting and kicking him
despite the pleas of others to stop, and the others fled the house because they
did not want to continue watching the beating. 
Chris Craven testified that Munn once threatened him by showing him
several photographs of Sartain after the beating in which Sartain’s
head looked “like a melon.”

Because there is
no evidence from which a rational jury could conclude that Orona
beat Sartain with his hands or feet, but that he did not use or intend to use
his hands or feet in a manner capable of causing death or serious bodily injury,
we hold that the trial court did not err by refusing to instruct the jury on
assault causing bodily injury.  We
overrule Orona’s second point.

C.  Requested Charge on Criminally Negligent
Homicide

To be found
guilty of murder, a defendant must be found to have intentionally or knowingly
caused the death of an individual.  See Tex. Penal Code Ann. § 19.02(b)(1).  Criminally
negligent homicide requires a less culpable mental state of criminal
negligence, meaning that the defendant ought to have been aware of a
substantial and unjustifiable risk that the individual would die.  See id.
§§ 6.03(d); 19.05(a) (Vernon 2003).

In this case, the
State does not dispute that criminally negligent homicide was a lesser-included
offense of murder and that Orona was entitled to a
criminally-negligent-homicide charge if some evidence in the record would
permit a jury to rationally find that if Orona was
guilty, he was guilty only of criminally negligent homicide.  See Guzman, 188 S.W.3d at
188; Lugo, 667 S.W.2d at 147.  In other words, there must be some evidence
that Orona failed to perceive the risk created by his
conduct.  See Mendieta v. State, 706 S.W.2d 651,
653 (Tex. Crim. App. 1986) (requiring evidence showing an unawareness of the risk
for charge on criminally negligent homicide); Jackson v. State, 248 S.W.3d 369, 371 (Tex. App.—Houston [1st
Dist.] 2007, pet. ref’d) (explaining that key to
criminal negligence is the failure of the actor to perceive the risk created by
his conduct).

Orona argues that there was no evidence that he knew
Sartain was an insulin-dependent diabetic, and consequently, he could not have
perceived the risk created by his conduct. 
However, even assuming some evidence existed that Orona
was unaware of Sartain’s insulin-dependent diabetic
condition, no evidence exists that Orona did not
intentionally or knowingly cause Sartain’s death by
punching and kicking him in the face and head. 
If sufficient evidence of more than one theory of the greater offense is
presented to allow the jury to be charged on alternate theories, the second
prong of the test is satisfied only if there is evidence that, if believed,
refutes or negates every theory that elevates the offense from the lesser to
the greater.  See Arevalo v. State, 970
S.W.2d 547, 549 (Tex. Crim. App. 1998). 
In other words, any evidence that Orona did
not know that Sartain required insulin (negating one theory of murder) would
not negate the remaining theories of the greater offense—that Orona intentionally or knowingly caused Sartain’s
death by kicking or punching him—to enable a rational jury to conclude that Orona was guilty only
of the lesser-included offense of criminally negligent homicide.  See id.;
cf. Stadt v.
State, 182 S.W.3d 360, 363 (Tex. Crim. App. 2005) (holding lesser-included-offense
instruction warranted when some evidence showed that defendant possessed lesser
culpable mental state applicable to each alterative theory alleged in
indictment).  Consequently, the trial
court did not err by refusing to instruct the jury on criminally negligent
homicide.  See Guzman, 188 S.W.3d at 188.

Even assuming
that the trial court erred by not including a charge on criminally negligent
homicide in the jury charge, any such error is harmless.  A jury’s failure to find a defendant guilty
of an intervening lesser-included offense—an offense between the requested
lesser-included offense and the charged offense—may render the trial court’s
failure to give the requested charge harmless.  Masterson v. State, 155
S.W.3d 167, 171 (Tex. Crim. App. 2005), cert.
denied, 546 U.S. 1169 (2006); Saunders
v. State, 913 S.W.2d 564, 573–74 (Tex. Crim. App. 1995).  As the court of criminal appeals explained in
Masterson,

This is so because
the harm from denying a lesser offense instruction stems from the potential to
place the jury in the dilemma of convicting for a greater offense in which the
jury has reasonable doubt or releasing entirely from criminal liability a
person the jury is convinced is a wrongdoer.  The intervening lesser offense is an available
compromise, giving the jury the ability to hold the wrongdoer accountable
without having to find him guilty of the charged (greater) offense.  While the existence of an instruction
regarding an intervening lesser offense (such as manslaughter interposed
between murder and criminally negligent homicide) does not automatically
foreclose harm—because in some circumstances that intervening lesser offense
may be the least plausible theory under the evidence—a court can conclude that
the intervening offense instruction renders the error harmless if the jury’s
rejection of that offense indicates that the jury legitimately believed that
the defendant was guilty of the greater, charged offense.

 

155
S.W.3d at 171; see also Saunders, 913
S.W.2d at 573–74 (holding that failure to charge jury on criminally negligent
homicide was harmless because significant evidence showed that defendant was
aware of risk of death, making manslaughter a realistic option for jury).

Here, the jury
had the ability to convict Orona of one of the lesser-included
offenses of manslaughter or aggravated assault had they any reservation about Orona’s guilt of the greater offense of murder.  The jury rejected this opportunity, impliedly
rejecting Orona’s defensive theories that he could
not have knowingly and intentionally caused Sartain’s
death because he was unaware that Sartain was an insulin-dependent diabetic and
impliedly rejecting Orona’s theory that Sartain was
still alive and hiding somewhere.  See Levan v. State,
93 S.W.3d 581, 586 (Tex. App.—Eastland 2002, pet. ref’d)
(“If the jury had harbored a reasonable doubt that appellant intentionally or
knowingly caused the victim’s death, it would not likely have convicted him of
murder anyway for lack of an acceptable compromise.”).  That the jury convicted Orona
of murder despite the availability of manslaughter shows that it believed that Orona possessed the specific intent required for murder.  See Guzman,
188 S.W.3d at 194 n.20 (noting that any error in refusing charge on deadly
conduct was harmless because charged intervening offense of aggravated assault
was realistic option for jury). 
Consequently, even if Orona was entitled to a
criminally-negligent-homicide charge, any error by the trial court in refusing
to include it in the jury charge was harmless.  See
Masterson, 155 S.W.3d at 171; Saunders, 913 S.W.2d at 573–74. 
We overrule Orona’s first point.

V.  Testimony
of Three Witnesses

In his third and
fourth points, Orona argues that certain testimony of
Johns, Brauer, and Osborne regarding statements Munn (who
did not testify) made to them constituted inadmissible hearsay, the admission
of which violated his right to cross-examination under the United States
Constitution and the Texas constitution.[2]

A.  Statements
at Issue

Johns testified that he was in his car at
a stoplight when Munn jumped into his car. 
Over defense counsel’s hearsay and Confrontation Clause objections, Johns
testified to the encounter with Munn as follows:

[Munn] was asking me, he goes, I
know the police talked to you, I need to know what you told them.  I said there was nothing to tell them, you
know.  I can’t tell them anything I don’t
know. . . .  He asked me if I still lived
in the same spot, and he said the wrong street. 
I’m like, yeah.  He goes, no, you
stay on this street.  He goes, if I need
you, I know where to find you.

 

Johns
took Munn’s statements as a threat.

          Brauer
testified, over defense counsel’s hearsay and Confrontation Clause objections, that
she was at Munn and Orona’s house one day when Munn told
Orona in front of her to feed and water his dog as he
pointed to the garage. Brauer explained that, to her
knowledge, Orona did not have a dog.

          Osborne testified, again over defense
counsel’s hearsay and Confrontation Clause objections, that Munn confided in
him that he and Orona “beat on Sartain,” “just
whooped his ass,” because Sartain owed them money.

B.  Confrontation Clause
Objections

The
Confrontation Clause of the Sixth Amendment to the United States Constitution
provides that “[i]n all criminal prosecutions, the
accused shall enjoy the right . . . to be confronted with the witnesses against
him.” U.S. Const. amend. VI.  The Sixth Amendment right of
confrontation is a fundamental right and is applicable to the states by virtue
of the Fourteenth Amendment.  Pointer v. State, 380
U.S. 400, 403, 85 S. Ct. 1065, 1067–68 (1965); Shelby v. State, 819 S.W.2d 544, 546 (Tex. Crim. App. 1991).

A trial court
violates an accused’s Sixth Amendment rights by
admitting a hearsay statement made by a nontestifying
declarant if the statement was testimonial and the
accused lacked a prior opportunity for cross-examination.  Crawford v. Washington, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374
(2004).  The threshold issue in
our Crawford analysis is whether the
statements at issue were testimonial.  Wilson v. State, 151 S.W.3d 694, 697
(Tex. App.—Fort Worth 2004, pet. ref’d); see Crawford, 541 U.S. at 51–52, 124 S.
Ct. at 1364.  The Supreme Court declined
to spell out a comprehensive definition of testimonial, but it stated that the
term “applies at a minimum to prior testimony at a preliminary hearing, before
a grand jury, or at a former trial; and to police interrogations.”  Crawford, 541 U.S. at 68, 124 S. Ct. at 1374.

Generally, a co-conspirator’s statements made in furtherance of the conspiracy
are nontestimonial. 
King v. State,
189 S.W.3d 347, 358 (Tex. App.—Fort Worth 2006, no pet.); Wiggins v. State, 152 S.W.3d 656, 659 (Tex. App.—Texarkana 2004,
pet. ref’d). 
Moreover, casual remarks made spontaneously to acquaintances are not testimonial in nature. 
See Woods v. State, 152 S.W.3d
105, 114 (Tex. Crim. App. 2004), cert.
denied, 544 U.S. 1050 (2005); see
also Wall v. State, 184 S.W.3d 730, 735 & n.11 (Tex. Crim. App. 2006).  We review the question of whether a statement
is testimonial or nontestimonial de novo.  See
Wall, 184 S.W.3d at 742.

In this case, all
of the complained-of testimony was nontestimonial in
nature.  Munn was a co-conspirator, and
the statements he made to Johns after the murder—about talking to the police
and knowing where to find Johns­—were made in furtherance of the conspiracy in
order to conceal Sartain’s murder.  See King,
189 S.W.3d at 358; Wiggins, 152
S.W.3d at 659.  Similarly, by referring
to Sartain as “the dog” in front of Brauer, Munn was
attempting to hide from Brauer the fact that Sartain
was in the garage.  See King, 189 S.W.3d at 358; Wiggins,
152 S.W.3d at 659.   And Munn’s statement
to Osborne that he and Orona had “beat on Sartain” was
a spontaneous, volunteered statement made in front of acquaintances.  See Woods,
152 S.W.3d at 114. 
Nothing about the context of Munn’s statements to Johns, Brauer, and Osborne would lead an objectively reasonable
witness to believe that the statements would be available for use later at
trial.  See Crawford, 541 U.S. at 52, 124 S. Ct.
at 1364 (defining testimonial statements to include “‘statements that were made
under circumstances which would lead an objective witness reasonably to believe
that the statement would be available for use at a later trial’”).  Consequently, we conclude that the trial
court did not err by admitting the complained-of statements over Orona’s Confrontation Clause objection.  See
Woods, 152 S.W.3d at 114.




 

C.  Hearsay Objections

Hearsay is a “statement,
other than one made by the declarant while testifying
at the trial or hearing, offered in evidence to prove the truth of the matter
asserted.”  Tex. R. Evid. 801(d).  But a statement meeting that definition is nevertheless
not hearsay if it is offered against a party and is a statement made by a
co-conspirator “during the course and in furtherance of the conspiracy.”  Tex. R. Evid.
801(e)(2)(E).  The
out-of-court statement by a co-conspirator must be more than merely related to
the conspiracy; it must further the conspiracy.  See
Guidry v. State, 9 S.W.3d 133, 148 (Tex. Crim. App. 1999), cert. denied, 531 U.S. 837 (2000); see also Byrd v. State, 187 S.W.3d 436,
440 (Tex. Crim. App. 2005) (explaining that a statement furthers a conspiracy
if it advances the cause of the conspiracy or serves to facilitate it).

Furthermore, a
statement that, at the time of its making, so far tended to subject the declarant to criminal responsibility that a reasonable
person in declarant’s position would not have made
the statement unless believing it to be true is an exception to the general
hearsay rule.  Tex. R. Evid. 803(24).  Statements against interest “must be self-inculpatory with corroborating circumstances to indicate
the trustworthiness of the statement[s]” to be admissible under rule 803(24).  Woods,
152 S.W.3d at 112. 
Both statements that are directly against the declarant’s
interest and collateral “blame-sharing” statements may be admissible under rule
803(24) if corroborating circumstances clearly indicate their trustworthiness.  See Walter
v. State, 267 S.W.3d 883, 899 (Tex. Crim. App.
2008).

We review a
trial court’s decision to admit or to exclude evidence under an abuse of
discretion standard. Weatherred v. State, 15 S.W.3d 540, 542 (Tex.
Crim. App. 2000); see also Coffin v.
State, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994) (holding that ruling on
admissibility of out-of-court statement under hearsay exception is within trial
court’s discretion, subject to review only for abuse of discretion).  A trial court does not abuse its discretion
as long as the decision to admit or to exclude the evidence is within the zone
of reasonable disagreement.  Montgomery v. State, 810
S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh’g).

Here, as we
explained above in our Confrontation Clause analysis, Munn was a
co-conspirator, and the statements he made to Johns and in front of Brauer after the murder were made
in furtherance of the conspiracy in order to conceal Sartain’s
murder.[3]  Consequently, those statements were not
hearsay, and the trial court did not abuse its discretion by admitting them
over Orona’s hearsay objection.  See Tex.
R. Evid. 801(e)(2)(E); King, 189 S.W.3d at 360; see also Byrd, 187 S.W.3d at 440.

What remains is
Munn’s statement to Osborne that he and Orona “beat
on Sartain,” “just whooped his ass.”  This
statement equally exposes Munn and Orona to criminal
responsibility for assaulting Sartain.  See Walter, 267 S.W.3d at 899
(explaining that statements that equally implicate declarant
and defendant may be admissible under rule 803(24)).  And the trustworthiness of the statement is
corroborated by other testimony in the record showing that Munn and Orona beat up Sartain; Johns testified that he witnessed
Munn and Orona beat up Sartain, Brauer
and Morante both testified that they saw blood on Orona’s and Munn’s shoes, and Craven testified that Munn showed
him photographs of Sartain in which his head looked “like a melon.”  See
Woods, 152 S.W.3d at 112.  Because the statement at issue was admissible
under rule 803(24) as a statement against interest, the trial court did not
abuse its discretion by admitting it over Orona’s
hearsay objection.  See Tex. R. Evid. 803(24).

Having addressed
all of Orona’s complaints under his third and fourth
points, we overrule those points.




 

VI.  Conclusion

Having overruled
Orona’s eight points, we affirm the trial court’s
judgment.

 

                                                                   SUE
WALKER

                                                                   JUSTICE

 

PANEL:  DAUPHINOT, WALKER, and GABRIEL, JJ.

 

DAUPHINOT, J.
filed a dissenting opinion.             

 

PUBLISH

 

DELIVERED:  February 24, 2011














 

 



 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO. 02-09-00182-CR


 

 


 
 
 Alejandro Orona
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE 
 
 


 

 

----------

 

FROM THE 396th District
Court OF Tarrant COUNTY

----------

 

DISSENTING OPINION

----------

 

I write separately because
the facts of this case are confusing and make it difficult to understand which
evidence must be and has been corroborated, which evidence must be and has not
been corroborated, and which evidence does not require corroboration.  Another issue is the evidentiary value of
statements made by a nontestifying co-defendant,
Kelly Munn, to third persons over objections to denial of confrontation.  Appellant Alejandro Orona
challenges the sufficiency of the evidence. 
The State was required to prove each and every element of the offense that
it alleged Appellant had committed,[4]
not merely that something bad happened. 
It is easy to get swept up in the sheer brutality of what the State
believes happened and to forget the mundane, unemotional role this court must
serve.  For these reasons, I write to
perform a pedestrian analysis of the evidence.

The Evidence

Natalie Bazan
was arrested while attempting to cash a forged check for Scott Sartain.  Bazan and Brian
Johns, her husband, searched for and confronted Sartain at Munn’s house and
assaulted Sartain by hitting him.  Munn
joined in the assault as Sartain was trying to leave Munn’s house.  Appellant entered the room,
saw Munn beating up Sartain, and started kicking and hitting Sartain.

Munn said, “Go to sleep, bitch,”
as he was hitting Sartain.  Bazan and someone else, perhaps Sanjuana
Garcia, “told them to stop it.”  Bazan, Johns, Garcia,
Melissa Morante,
Jose Vasquez, and other people in the house except Munn and Appellant left
while “the beating was still going on.” 

All the above testimony came
from Johns.  The second count of the
indictment alleged, in part, that Appellant intentionally or knowingly caused
the death of Sartain by kicking or by punching him.  There is no evidence of any other
assault.  If Sartain was beaten to death,
under the law of transferred intent,[5] Johns and Bazan are accomplices of both Munn and Appellant and
subject to the accomplice witness rules.[6]  

Johns also testified that on
a later day he returned to the house at Munn’s invitation.  He saw Sartain’s
head in Munn’s hand, and Appellant was standing next to Munn at the time.  Johns testified that on this visit, the house
smelled of rotten garbage and spoiled meat—like a dead animal. 

Rebecca Brauer
testified that she had seen blood on Appellant’s shoe, that Munn and Appellant
had mopped the floor one day, and that she thought Appellant had told her
something in Spanish that she believed meant to feed and water the dog, although
she knew of no dog.  But she said that she
had seen a pit bull puppy at Munn’s house before.  Brauer had seen
Sartain inject insulin and said that she found out later from Detective Ford
that Sartain needed it twice a day, although he did
not take good care of himself and injected street drugs. 

Dennis Osborne had no
connection to the beating of Sartain. 
Osborne testified that Munn had told him in Appellant’s presence that
they had gotten into a fight with Sartain. 
According to Osborne’s statement to Detective Ford, Munn told Osborne
that he and Appellant fought Sartain because Sartain owed Munn money.  

Osborne testified that Munn
told him that “they both beat on [Sartain] . . . .  They just whooped his ass.”  According to Osborne’s statement to Detective
Ford, Munn also told Osborne that they had tied Sartain up at one time.  Osborne testified that Munn told him that
Sartain had broken ribs, was dehydrated, and needed food because he was
diabetic.  In his written statement,
Osborne reported that Munn had told him that he thought that he had broken Sartain’s ribs and that Sartain had trouble “getting up and
walking around or breathing.” Osborne testified that Munn asked him to go get
Sartain a hamburger and to feed and check on him.  Osborne testified that he told Munn that he
would but then did not.  Appellant was
not present for this conversation.  In
his statement to the police, Osborne said that Munn told him a day or so later that
Sartain had recovered.

Osborne testified that at
some point he returned to Munn’s house and saw Munn and Appellant
mopping and taking trash out.  The
electricity had gone off, and “they left some food out and it stunk pretty bad in there.” 
Osborne said the house smelled like hot garbage and nasty meat.  He had heard that Sartain was in the garage,
but he did not see him.  Osborne
testified that a room behind the garage contained a lot of garbage bags, and
the smell was stronger “back in that area of the house.”   

While Munn was cutting
Osborne’s hair in the bathroom and Appellant was mopping the hallway and the
kitchen, Munn told Osborne that he could not believe that they had done that to
Sartain and that they had not wanted it to happen.  Munn told Osborne that “they cut him
up.”  Osborne testified that he was “not
sure” but was “pretty sure” that Appellant overheard the conversation.  Munn told Osborne that he had tried to get
insulin for Sartain but could not find it. Munn also told Osborne that Sartain
had died on Appellant’s watch and that Appellant was supposed to have given
Sartain food and water but did not.  

Osborne refused to help
dispose of the body and never saw it.  He
saw a car that he later heard was Sartain’s.  Osborne helped mutual friend Shannon Marlowe
and another man load the car onto a
dolly while Munn and Appellant were away from the house.  He also helped put a couple of trash bags
into the car, and he remembered seeing a bathtub in the bed of the truck
pulling the car. He did not see what was in the garbage bags but described it
as tree brush. Osborne heard that the car “went somewhere in Waco.”  

Osborne testified that he
had full access to the house and garage and could enter through the garage.  He never saw Sartain or any blood in the
garage or back room.  But in his
statement, Osborne said that he did not go to the house for about a week after
Munn asked him to get Sartain a hamburger, and when Osborne did return, he saw
what could have been blood stains.  

Appellant had a running
confrontation clause objection with regard to Osborne’s testimony as to all
statements made by Munn.

Morante testified that she saw
Appellant, Munn, Johns, and Johns’s girlfriend
beating up Sartain.  Johns was holding
Sartain while the girlfriend beat Sartain. 
Then Munn, Appellant, and Johns joined in the beating and kicking.  Morante said that
she, Garcia, and Vasquez told them to stop, and Munn told her to shut up and
stay out of it.  When Morante
left, she saw Johns dragging Sartain back toward Munn’s room.  Morante and Vasquez
went back the next day and heard loud music and moaning in the garage.  She testified that both Munn and Appellant
told her that Sartain was making the noise, and she noticed that both men had
blood on the tips of their shoes.  Morante also testified that Johns told her that he went in
the garage and saw “that they were cutting him [Sartain] in pieces.”   

Chris Craven testified in
exchange for promises of leniency that Munn told him that “they” had cut
Sartain up and put him in the trunk of a car and disposed of the body in the
lake.  Craven stated that Munn had
explained that they had killed Sartain because he owed Munn money and that Munn
had also told him that it was hard to get the smell out of the house and that
they had used a lot of chemicals to get the smell out.  

Munn showed Craven photos of
Sartain on his cell phone.  Sartain’s head was “like a melon.”  Munn told Craven that he did not want to end
up like that, and he should pay Munn quickly. 


Analysis

There is testimony that
Johns and Bazan participated in the beating.  If section 7.02(a) of the penal code alone is
the law of parties, then the analysis is different than if section 7.02(b) is
also the law of parties and not of co-conspiracy.[7]  The legislature may have intended section
7.02(b) to be the law of transferred intent, which originally applied to
homicide cases[8] and was later expanded to
felony murder.[9]  The Texas Court of Criminal Appeals in Montoya v. State,[10] however, announced that
both section 7.02(a) and section 7.02(b) of the penal code describe the law of
parties.[11]  I have voiced my disagreement with this
position.[12]  But if we are required to follow the Texas Court
of Criminal Appeals’s analysis of section 7.02, then all
co-conspirators are parties to murder, not to the offense of conspiracy to
commit murder, and Johns and Bazan are parties to
murder, not under the theory of transferred intent, but because they are
co-conspirators, even though they may not have intended Sartain’s
death.  That is, the result may not have
been the result they had intended, but they are still criminally responsible
for the acts of Munn and Appellant.[13]  If Bazan and Johns
are parties, their testimony must be corroborated by someone or something other
than testimony of another party or the hearsay statement of another party.[14]

The State offered oral
confessions of Munn, but Munn was not made available for confrontation and
cross-examination, and there was proper objection.  

Additionally, evidence of a
beating is not necessarily evidence of murder. 
Blood on the toes of shoes corroborates testimony of assault by beating and
kicking, but not necessarily of murder. 
Evidence of the odor of garbage is evidence of a bad smell, but do we
know that Sartain lay dead in Munn’s house long enough for the odor to be that
of Sartain’s decaying body?  There was testimony of food, including
chicken and dumplings, left to rot on the stove when the electricity went out
in the summer.  

An alternative theory of prosecution
was that Appellant intentionally or knowingly caused Sartain’s
death by preventing him from obtaining insulin when Appellant knew that Sartain
was an insulin-dependent diabetic.  There
is evidence that Munn knew Sartain needed insulin and that Munn told Osborne
that Sartain needed insulin.  Indeed,
knowing Sartain needed insulin, and knowing Sartain was being held prisoner,
Osborne told Munn that he would bring Sartain food but did not.  Morante also knew that
Sartain injected insulin.  But what is
the evidence that Appellant knew that Sartain would die without insulin?        

The third theory of
prosecution was that Appellant intentionally or knowingly caused Sartain’s death by a manner and means unknown to the grand
jury.  What is the evidence that
Appellant, either as a principal or as a party, intended to cause Sartain’s death or knew that his actions would cause Sartain’s death?  
What is the evidence of murder rather than manslaughter? 

The
testimony against Appellant regarding his conduct after the original fight,
other than testimony of his presence and his cleaning the house and garage, was
primarily a recitation of statements by Munn.  Munn said that he and Appellant cut up Sartain’s body.  Munn
told Osborne that Sartain owed him and Appellant money and that they both had
beaten Sartain and put him in the garage.  But Munn also told Osborne that Munn was
trying to find insulin for Sartain and that Sartain had died while Appellant
was responsible for him.   

The fact that the evidence
may be admissible as an exception to the hearsay rule does not mean that it
necessarily satisfies the burden of corroboration.  The Texas Court of Criminal Appeals has
discussed the application of evidentiary rule 803(24) in Guidry v. State,

We have recognized
that Rule 803(24) “provides for an exception to the hearsay rule for a
statement against the declarant’s interest (,
but) . . . does not provide a hearsay rule exception for a declarant’s
statement which is against someone else’s interest, e.g. a third-party, a
co-actor, or a co-defendant.”  That is,
unless the statement against the third party’s interest is also
sufficiently against the declarant’s interest as to
be reliable.  For example, in Dewberry
v. State,  statements in which the declarant (“Chris”)
incriminated both himself and the defendant, jointly, were held sufficiently
reliable . . . .[15]

The
Guidry court explained that while a
statement against the declarant’s penal interest may
be reliable, it is doubtful that a statement against someone else’s penal
interest possesses “particularized guarantees of trustworthiness” sufficient to
overcome the presumption of hearsay unreliability.[16]  Additionally, rule 803(24) requires evidence that
“corroborating circumstances clearly indicate the trustworthiness of the
statement.”[17]  An accomplice cannot corroborate another
accomplice’s testimony.[18]  What is the evidence that corroborates the
statements of Munn and of the other accomplices?  Indeed, what is the evidence, other than
Munn’s statement that he tried unsuccessfully to find insulin for Sartain, that
Sartain was deprived of insulin?

Lest I be misunderstood, I
am not saying that the evidence is insufficient because there is an alternative
reasonable hypothesis not consistent with Appellant’s guilt.  I am asking what evidence corroborates
accomplice testimony of intentional and knowing murder and whether the State
can lawfully prove murder by accomplice statements that were not subjected to
confrontation and cross-examination.[19]  Because the majority does not answer these
questions, I must respectfully dissent.

 

 

LEE ANN DAUPHINOT

                                                                             JUSTICE

 

 

PUBLISH

 

DELIVERED:  February 24, 2011

 











[1]The dissent confuses and mixes rule 803(24)’s
corroboration requirement—which Orona does raise,
with an article 38.14 corroboration requirement—which Orona
does not raise.  Compare Tex. R. Evid. 803(24) (requiring
that in criminal cases a statement against interest tending to expose the declarant to criminal liability is not admissible unless
corroborating circumstances clearly indicate the trustworthiness of the
statement), with Tex. Code Crim.
Proc. Ann. art. 38.14 (Vernon 2005) (requiring corroboration
of accomplice witness testimony by other evidence tending to connect the
defendant with the offense committed). 
Although Orona does not anywhere in his brief
challenge the corroboration of Bazan’s and Johns’s testimony, the dissent sua
sponte raises this issue.  Even if Orona had
raised an accomplice witness corroboration issue, direct testimony from
witnesses who were not involved in the beating or were not otherwise
accomplices or parties exists tending to connect Orona
with the charged offense and corroborating Bazan’s
and Johns’s testimony.  See Tex. Code Crim. Proc. Ann. art. 38.14; Cathey v. State, 992 S.W.2d 460, 462­–63
(Tex. Crim. App. 1999), cert. denied,
528 U.S. 1082 (2000).  Testimony from Brauer, Morante, and Osborne
established that Orona and Munn beat up Sartain in
their house and that, after the fight, they had blood on their shoes, moans
could be heard coming from the garage over loud music, the house smelled of
rotting meat, Orona and Munn cleaned the house and
mopped the floors, and Sartain’s car, along with
trash bags and a bathtub, were hauled from Orona and
Munn’s house.  In part V of our opinion,
we address the issue Orona did raise—that the
statements of Jones, Brauer, and Osborne constitute
“inadmissible hearsay” and “were not admissible because there is no evidence
that clearly indicated they were trustworthy.”





[2]Orona does not contend that the Texas constitution provides
greater protection than the United States Constitution; consequently, we
analyze his argument only under the Sixth Amendment to the United States
Constitution.  See, e.g., Lagrone v. State, 942 S.W.2d 602, 614 (Tex. Crim.
App.), cert. denied, 522 U.S. 917 (1997);
Hale v. State, 139 S.W.3d 418, 421
(Tex. App.—Fort Worth 2004, no pet.) (analyzing
federal and state confrontation claim under federal constitutional standards
only because appellant did not distinguish the protections under each).





[3]To the extent that Brauer’s
testimony that Munn pointed toward the garage while referring to “the dog”
constituted inadmissible hearsay, its admission was harmless error because the
fact that Sartain was in the garage was admitted into evidence through Morante’s and Osborne’s testimony.  See
Estrada v. State, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (holding
that any error in the admission of evidence was harmless in light of the proper
admission into evidence of very similar evidence), cert. denied, No. 10-6446 (U.S. Jan. 10, 2011); see also Foster v. State, 779 S.W.2d
845, 862 (Tex. Crim. App. 1989) (explaining that nonverbal conduct is
considered hearsay when it is an assertive substitute for verbal expression), cert. denied, 494 U.S. 1039 (1990); Graham v. State, 643 S.W.2d 920, 926
(Tex. Crim. App. 1981) (“[A]n assertion by conduct can be hearsay.”).





[4]See Butler v. State, 769
S.W.2d 234, 239 (Tex. Crim. App. 1989), overruled on other grounds by Geesa v. State,
820 S.W.2d 154, 161 (Tex. Crim. App. 1991),
overruled on other grounds by Paulson
v. State, 28 S.W.3d
570, 571 (Tex. Crim. App. 2000).





[5]See Tex. Penal Code Ann. § 6.04(b) (Vernon 2003).





[6]See Kutzner v. State, 994 S.W.2d 180, 187 (Tex. Crim. App. 1999); McFarland
v. State, 928 S.W.2d 482, 514 (Tex. Crim. App. 1996), cert.
denied, 519 U.S. 1119 (1997).  





[7]See Tex. Penal Code Ann. § 7.02 (Vernon 2003).





[8]See generally Washburn v.
State, 167 Tex. Crim. 125, 318 S.W.2d 627 (1958), cert. denied, 359 U.S. 965 (1959).





[9]See generally Kuykendall v.
State, 609 S.W.2d 791 (Tex. Crim. App. 1980), disavowed on other grounds by Cook v. State, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993) (citing Madden v. State, 799 S.W.2d 683,
686 n.3 (Tex. Crim. App. 1990), cert.
denied, 499 U.S. 954 (1991)).





[10]810 S.W.2d 160, 165 (Tex. Crim. App. 1989), cert. denied, 502 U.S. 961 (1991).





[11]See Tex. Penal Code Ann. § 7.02.  





[12]See, e.g.,
Barnes v. State, 56 S.W.3d 221,
240–41 (Tex. App.—Fort Worth 2001, pet. ref’d)
(Dauphinot, J., concurring) (majority opinion overruled by Bell v. State, 169 S.W.3d 384, 398B99 (Tex. App.—Fort Worth 2005, pet. ref’d)).





[13]See Tex. Penal Code Ann. §7.02(b); Montoya, 810 S.W.2d at 165.





[14]See Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).





[15]Guidry v. State, 9 S.W.3d 133, 149
(Tex. Crim. App. 1999) (citations omitted), cert.
denied, 531 U.S. 837 (2000).





[16]Id. at 151.





[17]Tex. R. Evid. 803(24).





[18]Tex. Code Crim. Proc. Ann. art. 38.14.





[19]See U.S. Const. amends. V, VI; Crawford
v. Washington, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364 (2004).