**Opinion issued August 13, 2013**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————————

**NO. 01-12-00527-CR**

———————————————

**NATHANIEL JEROME FLOWERS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1257482**

---

## MEMORANDUM OPINION

A jury convicted appellant, Nathaniel Jerome Flowers, of the first-degree felony offense of injury to a child—serious bodily injury and, after finding the allegations in an enhancement paragraph true, assessed punishment at confinement

for life and a $10,000 fine.[1]  In one issue, appellant contends that the trial court erroneously refused to instruct the jury on the lesser-included offense of injury to a child—bodily injury.

We affirm.

## Background

Appellant resided at the Crofton Place Apartments in northeast Houston with his girlfriend, Shara Kelly, Shara's three-month-old son, K.K., the complainant, Shara's sister, Shayla Kelly, Shayla's two-year-old daughter, Z.K., and Shayla's boyfriend, Alex Acosta.  On the afternoon of March 31, 2010, appellant, K.K., Acosta, and Z.K. were alone at the apartment.  Shara had been gone from the apartment for "a while" when Shayla called Acosta and asked him if he could pick her up from a friend's apartment.  Acosta placed K.K. in his car seat, which he set by the front door to the apartment, and informed appellant, who was outside talking to his sister, that he was taking Z.K. with him to pick up Shayla and that he had put K.K. in his car seat.  At the time Acosta left the apartment, K.K. was "healthy, well-rounded, smiling, [and] playing like an ordinary baby."  He testified that nothing was wrong with K.K. when he left and that K.K. was awake and "normal."

---

[1]     *See* TEX. PENAL CODE ANN. § 22.04(a)(1) (Vernon Supp. 2012).

Approximately twenty minutes after he left the apartment, Acosta received a phone call from Chris Robinson, a neighbor, who informed him that something had happened to K.K. and that he was being taken to the hospital. Acosta picked Shayla up and drove to L.B.J. Hospital, where they met appellant and Shara. Acosta testified that appellant did not seem sad over K.K.'s condition, but he did seem confused, "like he didn't know . . . what was going on." Acosta testified that hospital personnel eventually took K.K. off life support, and he died on April 2, 2010.

Patrick Baker was visiting Chris Robinson on the afternoon of the incident. While Baker, Robinson, and other friends were outside, a teenager whom Baker knew only as "Ese" came from the direction of appellant's apartment and told the group, "Something's wrong with the baby. The baby was hurt." Baker and Robinson went upstairs to appellant's apartment and saw K.K. lying on a table in the apartment. K.K. appeared lifeless and unresponsive. Appellant was "pacing around, running back and forth," and Baker stood in front of the door to block the way outside because he was afraid that appellant would try to flee. Robinson then called 9-1-1 and, at the direction of the dispatcher, began performing CPR on K.K. The trial court admitted into evidence a recording of Robinson's 9-1-1 call. A voice on the recording stated, "I don't know what's wrong with him. I fed him a bottle, and he started throwing up." Baker identified this voice as appellant's.

3

According to Baker, appellant just stood in the apartment and did not try to help Robinson. Appellant did not appear to be emotional.

Christopher Stoneham, a firefighter-paramedic with the Houston Fire Department, was dispatched to appellant's apartment for a "pediatric cardiac arrest" case. When Stoneham entered the apartment, K.K. was lying on the kitchen table. K.K. was not breathing, and he had no pulse. When Stoneham attempted to intubate K.K., he noticed bruising on K.K.'s upper gums and lips. He pointed the bruising out to his supervisor, and they decided to notify the police about it after they arrived at the hospital. At the hospital, Stoneham spoke with Shara and appellant. Stoneham brought up the bruising that he had noticed in K.K.'s mouth, and appellant told him that a bottle had broken in K.K.'s mouth. Stoneham reported this statement to Houston Police Department ("HPD") officers when they arrived at the hospital.

HPD Officer I. Harris and his partner, Officer A. Rodriguez, spoke with the paramedics at the hospital, and, after they did so, they had concerns that K.K. had possibly been abused. The officers also briefly spoke with appellant at the hospital, and appellant told the officers that K.K. had been asleep, but then he began to cry, and, when appellant checked on him, K.K. started to vomit. Appellant stated that K.K.'s eyes started to roll back in his head when he picked him up, and he started CPR before calling 9-1-1. The officers asked appellant

4

about the injuries to K.K.'s gums and lips, and appellant responded that while he was feeding K.K. a bottle, the bottle slipped and hit his mouth, causing swelling and bruising to K.K.'s upper gums. Officer Harris reported that appellant seemed nervous during this conversation; he did not appear to be sad, and he was not crying. Officer Rodriguez agreed that appellant seemed nervous and evasive.

HPD Homicide Division Sergeant R. Torres obtained formal statements from both Shara and appellant at HPD headquarters on the night K.K. was brought to the hospital.[2] In his statement, appellant told Sergeant Torres that K.K. had been asleep in his bed when appellant noticed that he was not breathing. When appellant picked him up, K.K. started vomiting. Appellant then "tried [his] best to give [K.K.] CPR," but K.K. lost consciousness. Appellant told his neighbors what happened, and they called 9-1-1. Appellant told Sergeant Torres that, to his knowledge, K.K. had not had any accidents, he had not been dropped by anyone, and no one had hit him. Appellant admitted that when he picked K.K. up, he "probably was a little rough with him," but he denied ever trying to hurt K.K.

HPD Crime Scene Unit Officer S. Langford was dispatched to L.B.J. Hospital on the evening of March 31, 2010. While at the hospital, Officer Langford took several photographs depicting visible injuries to K.K., including

---

[2] Sergeant Torres spoke with Shara and appellant while K.K. was still alive. He testified that the HPD Homicide Division routinely handles cases involving serious bodily injury to infants, even if the infants are still alive.

cuts and bruises on his lips. Officer Langford then went to appellant's apartment to take photographs and collect relevant evidence. Officer Langford photographed several plastic baby bottles in the apartment; she did not see any glass bottles, nor did she see any broken glass in the apartment. Officer Langford did not see anything in the apartment that could have caused the injuries to K.K.'s mouth.

Alex Acosta also testified that the day after K.K. was taken to the hospital, he found a baby blanket with what looked like bloodstains on it tucked in between the mattress and box spring in the bedroom that Shara, K.K., and appellant shared. Kimberly Gooden, Shara's mother and K.K.'s grandmother, went to Shara's apartment while K.K. was in the hospital to pick up a change of clothes for Shara. While she was searching for clothes, she opened up a bag, and a baby-sized shirt and a towel, both of which appeared to have bloodstains on them, fell out of the bag. Kimberly stated that the other clothes in that particular bag were men's clothes. Kimberly handed the shirt and towel over to Acosta, who was supposed to meet with a detective later that night. Acosta testified that K.K. had been wearing the shirt that Kimberly discovered when Acosta left the apartment to pick up Shayla on March 31. Acosta turned both of these items over to HPD Investigator X. Avila.

Investigator Avila obtained a statement from appellant following his arrest several days after K.K.'s death. In this interview, appellant stated that Shara told

6

him she had dropped K.K. on the floor a week before he went to the hospital. Investigator Avila asked appellant how K.K. injured his mouth, and appellant responded that he was not sure but he guessed that K.K. fell on his lip. He also stated that Shara told him that she was trying to feed K.K., and, when he would not take the bottle, she forced it in his mouth and he cut his lip. Appellant opined that he thought that, on March 31, Shara dropped K.K. and "busted his lip" and then left K.K., who was fine and sleeping, with appellant. Appellant stated that after Shara left, he fed K.K., who went back to sleep, but within an hour, K.K. lost consciousness. Investigator Avila then asked how K.K. was injured within that one-hour time span, and appellant responded that he thought Acosta injured him. He told Investigator Avila that Acosta took K.K. into his room before he left to pick up Shayla, and appellant later heard K.K. crying and a loud noise that sounded "like the baby had [fallen] or somebody was trying to harm the baby." He thought that Acosta had dropped K.K. Appellant then said that either Shara or Acosta injured K.K. Later, in the same interview, appellant admitted that he fabricated the accusation against Acosta in an effort to protect Shara, who was the one who had hurt K.K.

After appellant gave this statement, officers told him that they were going to transport him to the Harris County Jail. At this point, appellant told Investigator Avila, "I have a problem. I need help. And I want to give you another statement."

7

In this second interview, appellant stated that K.K. started to cry, so he fed K.K. and placed him back in his bed, where he fell asleep. K.K. slept for around an hour until he started to cry again. Appellant fed K.K. a second time and changed his diaper. About twenty minutes after this, K.K. started crying again, and when appellant tried to pick K.K. up, K.K. slipped out of his hands and appellant dropped him. After he fell to the ground, K.K. lost consciousness.

Dr. Marcella Donaruma, a specialist in child abuse pediatrics at Texas Children's Hospital, where K.K. was transferred before his death, consulted on K.K.'s case. Dr. Donaruma testified that K.K. had brain damage and a skull fracture to the parietal bone above his left ear. She determined that K.K.'s injuries were consistent with abusive head trauma. According to Dr. Donaruma, K.K.'s head injuries could have been caused by someone's slamming an object into his head or slamming his head against an object, possibly combined with shaking K.K., but the injuries were not consistent with merely shaking K.K. in the absence of blunt force trauma.

The blunt force trauma in this case caused hemorrhaging in K.K.'s brain and his eyes and affected his brain stem, such that his brain was deprived of oxygen. Dr. Donaruma stated that the impact would have had an instantaneous effect on K.K. and his behavior, creating an "immediate altered level of consciousness." She testified that it was not possible for K.K. to have sustained the injuries that he

8

did and yet not manifest any symptoms until several hours or days later. She also testified that the extent of K.K.'s injuries was not consistent with K.K.'s being dropped and hitting his head. Dr. Donaruma stated that the injuries to K.K.'s mouth were consistent with blunt force trauma, but were not consistent with his being cut with an object like a broken glass bottle. Dr. Donaruma concluded that K.K.'s brain injuries caused his death.

Dr. Darshan Phatak, an assistant medical examiner with the Harris County Institute of Forensic Sciences, did not perform K.K.'s autopsy himself, but he did complete a review of the autopsy findings. Dr. Phatak testified that the cause of K.K.'s death was "complications of blunt trauma of [the] head with skull fractures, subdural hemorrhages, and brain injury." Dr. Phatak testified that K.K.'s multiple contusions, three skull fractures, and seven posterior rib fractures indicated that he had suffered blunt force trauma that could have occurred only in a violent or abusive situation. He agreed with Dr. Donaruma that shaking alone would not have caused K.K.'s skull fractures. Dr. Phatak stated that K.K. had two fractures to his left parietal bone and one fracture to his right occipital bone, indicating that K.K. had suffered at least two or three impacts to his head. He testified that K.K.'s injuries were not consistent with his being dropped on his head, as that action would not explain the presence of fractures on opposite sides of his skull. He agreed that the brain "responds to skull injuries rapidly" and that, after the impact,

9

K.K. would have immediately started showing symptoms such as loss of consciousness. He stated that K.K. would have appeared limp and unresponsive and that he would not have been able to continue crying.

Investigator Avila requested that the crime lab test the stains found on the shirt and towel recovered from appellant's apartment to determine if those stains were bloodstains and to determine the DNA contributors. Shauna Schoonover, an HPD criminalist, tested the stains on both items and confirmed that these stains were bloodstains. Robin Guidry, the technical manager of the DNA section of the HPD crime lab, then conducted DNA analysis of the stains. Guidry testified that the DNA profile obtained from both the towel and the shirt was consistent with K.K.'s known DNA profile. Guidry also testified that the bloodstain on the shirt contained not just K.K.'s DNA but also DNA from another contributor. Priscilla Hill, an HPD criminalist, obtained appellant's DNA profile from a buccal swab and testified that appellant could not be excluded as the other DNA contributor to the bloodstain on the shirt.

The State charged appellant with intentionally or knowingly causing serious bodily injury to a child. The indictment alleged the following manner and means of committing the offense:

> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, NATHANIEL JEROME FLOWERS, hereafter styled the Defendant, heretofore on or about MARCH 31, 2010, did then and

10

there unlawfully, intentionally and knowingly cause serious bodily injury to [K.K.], hereinafter styled the Complainant, a child younger than fifteen years of age, by STRIKING THE COMPLAINANT WITH AN UNKNOWN BLUNT OBJECT.

It is further presented that in Harris County, Texas, NATHANIEL JEROME FLOWERS, hereinafter styled the Defendant, heretofore on or about MARCH 31, 2010, did then and there unlawfully intentionally and knowingly cause serious bodily injury to [K.K.], hereinafter styled the Complainant, a child younger than fifteen years of age, by STRIKING THE COMPLAINANT AGAINST AN UNKNOWN BLUNT OBJECT.

It is further presented that in Harris County, Texas, NATHANIEL JEROME FLOWERS, hereinafter styled the Defendant, heretofore on or about MARCH 31, 2010, did then and there unlawfully intentionally and knowingly cause serious bodily injury to [K.K.], hereinafter styled the Complainant, a child younger than fifteen years of age, by SHAKING THE COMPLAINANT WITH THE DEFENDANT'S HANDS.

At the charge conference, defense counsel requested that the trial court include an instruction on the lesser-included offense of injury to a child—bodily injury. Counsel stated, "We believe that the evidence, through various statements of the defendant and through the medical records showing bruising and showing additional injuries besides the head injury that was fatal, raises at least a scintilla of evidence as to whether or not the defendant caused just bodily injury." The trial court denied this request. Therefore, the only lesser-included-offense instruction that the court included in the charge was an instruction on whether appellant caused serious bodily injury to K.K. by criminal negligence.

11

The jury found appellant guilty of the charged offense, intentionally or knowingly causing serious bodily injury to a child, and, after finding the allegations in an enhancement paragraph true, assessed punishment at confinement for life and imposed a $10,000 fine.

## Lesser-Included Offense Instruction

In his sole issue, appellant contends that the trial court erred in refusing to submit a jury instruction on the lesser-included offense of injury to a child—bodily injury.

### A. *Standard of Review*

Code of Criminal Procedure article 37.09 provides that an offense constitutes a lesser-included offense of a charged offense if:

(1)    it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2)    it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3)    it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4)    it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09 (Vernon 2006).  We use the statutory elements and the facts alleged in the charging instrument to find lesser-included offenses.  *See Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007).

12

We employ a two-step analysis in determining whether the trial court should have given an instruction on a lesser-included offense. *See id.* The first step in the analysis is whether an offense is a lesser-included offense of the charged offense, and this is a question of law that does not depend on the evidence to be produced at trial. *Id.* This step must be capable of being performed before trial "by comparing the elements of the offense as they are alleged in the indictment or information with the elements of the potential lesser-included offense." *Id.* at 535–36; *see also Ex parte Watson*, 306 S.W.3d 259, 265 (Tex. Crim. App. 2009) (clarifying, in intoxication-assault case, that particular manner in which injury was caused was not "element" of offense and, thus, this descriptive language in indictment should not be considered at first step of lesser-included offense analysis).

The second step of the analysis asks whether there is evidence that supports giving the lesser-included offense instruction to the jury. *Hall*, 225 S.W.3d at 536. The Court of Criminal Appeals has held that

> [a] defendant is entitled to an instruction on a lesser-included offense where the proof for the offense charged includes the proof necessary to establish the lesser-included offense and there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense.

*Id.* (quoting *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)); *see also Schmidt v. State*, 278 S.W.3d 353, 362 (Tex. Crim. App. 2009) (stating that "there must be affirmative evidence to rebut the greater element, and the jury may not

13

simply disbelieve evidence establishing the greater" charged offense to entitle defendant to lesser-included offense instruction). In this portion of the analysis, anything more than a scintilla of evidence entitles the defendant to the instruction. *Hall*, 225 S.W.3d at 536. The evidence must establish the lesser-included offense as "a valid, rational alternative to the charged offense." *Id.*; *Williams v. State*, 294 S.W.3d 674, 681 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (stating that "[t]here must be affirmative evidence in the record raising the lesser offense before an instruction is warranted").

The Court of Criminal Appeals has held that the test for determining whether evidence is legally sufficient and the test for determining whether to submit a lesser-included offense instruction are "quite different." *Wasylina v. State*, 275 S.W.3d 908, 909 (Tex. Crim. App. 2009) (quoting *Hampton v. State*, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005)). "The evidence could easily be legally sufficient to support a conviction for a lesser-included offense but not justify the submission of a lesser-included-offense instruction because the evidence does not show that the defendant is guilty *only* of the lesser-included offense." *See id.* at 909–10 (emphasis in original).

### B. Appellant's Entitlement to Lesser-Included Offense Instruction

Penal Code section 22.04(a)(1) provides that a person commits the offense of "injury to a child—serious bodily injury" if he intentionally, knowingly,

14

recklessly, or with criminal negligence, causes serious bodily injury to a child. TEX. PENAL CODE ANN. § 22.04(a)(1) (Vernon Supp. 2012). When the conduct is committed intentionally or knowingly, the offense is a first-degree felony. *Id.* § 22.04(e). Section 22.04(a)(3) provides that a person commits the offense of "injury to a child—bodily injury" if he intentionally, knowingly, recklessly, or with criminal negligence, causes bodily injury to a child. *Id.* § 22.04(a)(3). If the conduct is committed intentionally or knowingly, the offense is a third-degree felony. *Id.* § 22.04(f). Here, the State agrees that the offense of injury to a child— bodily injury is a lesser-included offense of injury to a child—serious bodily injury because the only difference between the two offenses is that a less serious injury to the same person suffices to constitute the offense of injury to a child—bodily injury. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09(2).

We must now determine whether the evidence presented at appellant's trial supports giving an instruction on the lesser-included offense of injury to a child— bodily injury. *See Hall*, 225 S.W.3d at 531 (stating that second step in analysis is "determining whether the evidence at trial supports giving one of these predetermined lesser-included offense instructions").

As evidence that the only offense that he committed was the offense of causing bodily injury, not serious bodily injury, to K.K., appellant points to the testimony of Christopher Stoneham, Officer Harris, and Officer Rodriguez

15

concerning the injuries to K.K.'s gums and lips. Specifically, he points to the testimony that each of these individuals asked appellant about the injuries to K.K.'s gums and lips, and appellant responded that a bottle slipped while he was feeding K.K., causing the injuries. Appellant also points to Dr. Phatak's testimony agreeing with defense counsel that the bruising on K.K.'s body, including the bruising in his mouth, could have occurred at a different time than the fatal head injuries. We disagree with appellant's contention that this evidence entitles him to an instruction on the lesser-included offense of injury to a child—bodily injury.

This evidence may be sufficient to support a conviction for injury to a child—bodily injury, but it does not demonstrate that appellant is guilty *only* of this lesser-included offense. *See Wasylina*, 275 S.W.3d at 909–10. As the State points out, in his statements to medical and law enforcement personnel, appellant offered several different versions of how K.K. was injured, at times blaming Shara or Acosta, and at times stating that he himself had been rough with K.K. and had dropped K.K. on his head. The consistent thread running through all of appellant's statements, however, is that he was alone with K.K. at the time K.K. began showing symptoms of a head injury and during the time immediately preceding when K.K. became symptomatic. Both Dr. Donaruma and Dr. Phatak testified that the effect of a serious brain injury on a child is instantaneous, such that K.K. would have immediately lost consciousness or become limp and unresponsive. The

16

doctors agreed that it was not possible for K.K. to suffer multiple skull fractures but not exhibit symptoms until several hours or several days later. Dr. Phatak also testified that a single instance of dropping K.K. on his head could not have caused his injuries, as he had skull fractures on opposite sides of his head. Acosta testified that when he left the apartment approximately twenty minutes before receiving a phone call informing him that K.K. needed to go to the hospital, appellant was the only adult present at the apartment with K.K., and K.K. was happy and healthy, and he seemed like a normal baby. Appellant himself stated that he was alone with K.K. both when the bottle broke in K.K.'s mouth and when K.K. became unresponsive from the more serious injury.

Based on the evidence presented at trial, the only rational explanation for K.K.'s fatal injuries is that appellant either struck K.K. in the head with a blunt object multiple times or struck K.K.'s head against a blunt object multiple times while appellant was alone with him, causing K.K. to quit breathing and become limp and unresponsive. *See Hall*, 225 S.W.3d at 536 (stating that evidence must establish lesser-included offense as "valid, rational alternative to the charged offense"). The evidence suggesting that appellant caused the injuries to K.K.'s gums and lips while trying to feed him a bottle does not show that appellant was guilty *only* of a lesser-included offense because it does not match the conduct in the indictment—that of striking or shaking K.K. *See Wasylina*, 275 S.W.3d at

17

909–10 (holding that although evidence may be sufficient to convict defendant of lesser-included offense, to entitle defendant to lesser-included offense instruction, evidence must show that defendant was guilty *only* of lesser-included offense). Instead, this evidence suggests that appellant caused both bodily injury to K.K.—injuring his gums and lips with a bottle—and serious bodily injury—fracturing his skull by striking him with or against a blunt object while he was alone with appellant in the apartment and causing him to go limp and lose consciousness. Because the evidence does not demonstrate that if appellant was guilty, he was guilty only of the lesser-included offense of injury to a child—bodily injury, we conclude that the trial court properly refused to submit an instruction on that lesser-included offense.

### Harm Analysis

Even if the trial court erred by refusing to instruct the jury on the lesser-included offense of injury to a child—bodily injury, however, we conclude that appellant did not suffer harm from this refusal. *See Trevino v. State*, 100 S.W.3d 232, 242 (Tex. Crim. App. 2003) (holding that where, as here, defendant properly objected to error in charge, we must reverse if record demonstrates that error "was calculated to injure the rights of the defendant" or caused "some harm"); *O'Brien v. State*, 89 S.W.3d 753, 756 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd)

18

(holding that reversal is required if charge error resulted in some harm to defendant, "some" meaning "any").

The Court of Criminal Appeals has held that when the jury is charged on a lesser-included offense, albeit not one that the defendant requested, the jury's decision to convict of the charged offense, instead of convicting of the "intervening lesser-included offense," may render a failure to submit the requested lesser-included offense harmless. *Masterson v. State*, 155 S.W.3d 167, 171 (Tex. Crim. App. 2005). The court reasoned that the harm that arises from denying a lesser-included offense instruction "stems from the potential to place the jury in the dilemma of convicting for a greater offense in which the jury has reasonable doubt or releasing entirely from criminal liability a person the jury is convinced is a wrongdoer." *Id.* The intervening lesser-included offense is thus an "available compromise, giving the jury the ability to hold the wrongdoer accountable without having to find him guilty of the charged (greater) offense." *Id.*; *cf. Henry v. State*, 263 S.W.3d 151, 156 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that "some harm" exists when absence of lesser-included offense instruction in charge leaves jury with sole option to convict of charged offense or acquit). A defendant may still suffer harm when an intervening lesser-included offense instruction is given "because in some circumstances that intervening lesser offense may be the least plausible theory under the evidence," but we may conclude that the

intervening instruction "renders the error harmless if the jury's rejection of that offense indicates that the jury legitimately believed that the defendant was guilty of the greater, charged offense." *Masterson*, 155 S.W.3d at 171–72.

Here, the trial court included a lesser-included offense instruction on the offense of causing serious bodily injury by criminal negligence, a more realistic option, given the evidence presented, than appellant's contention that the sole injuries that he caused K.K. were the bruises to his gums and lips. *See id.* at 172 (holding that, in capital murder case, manslaughter was plausible theory under evidence and, therefore, trial court's decision to submit instruction on this lesser-included offense rendered harmless court's failure to submit requested instruction on criminally negligent homicide). This instruction gave the jury "the ability to convict appellant of a lesser included offense had they any reservation about appellant's guilt of the greater, charged offense." *See Partida v. State*, 279 S.W.3d 801, 804 (Tex. App.—Amarillo 2007, pet. ref'd). The jury was also instructed that, if it found the allegations in the enhancement paragraph true, the applicable punishment range was fifteen to ninety-nine years or life. The jury assessed punishment at confinement for life, demonstrating that "the jury believed appellant was guilty of the greater offense instead of a lesser included offense." *See id.* at 804–05 (concluding, in case in which defendant received intervening lesser-included offense instruction, that any error in failure to submit requested

20

instruction was harmless). We therefore conclude that any error in the trial court's failure to instruct the jury on the lesser-included offense of injury to a child—bodily injury is harmless.

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.


                                        Evelyn V. Keyes
                                        Justice

Panel consists of Justices Keyes, Higley, and Bland.

Do Not Publish. TEX. R. APP. P. 47.2(b).