**Richard Allen MASTERSON,**
**Appellant,**

v.

**The STATE of Texas.**

**No.  AP–74344.**

Court of Criminal Appeals of Texas.

Feb. 2, 2005.

Janet Morrow, Spring, for Appellant.

Kelly Ann Smith, Asst. DA, Houston, Matthew Paul, State's Attorney, for State.

## OPINION

KELLER, P.J., delivered the opinion of the unanimous Court.

Appellant was convicted of a capital murder[1] committed on January 27, 2001. Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure, Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death.[2] Direct appeal to this Court is automatic.[3] Appellant raises eight points of error. We will affirm.

## I. GUILT

### A. Appellant's recorded confession

In points of error two and three, appellant complains about the admission into evidence of a tape-recorded confession taken from him by a Texas police officer while appellant was in custody in Florida. In point of error two, he complains that his confession was induced by a promise of leniency for his nephew. In point of error three, he complains that his confession was taken after he invoked his right to counsel.[4]

### 1. Background

After the victim was murdered, appellant drove the victim's car to Georgia. He left that car with relatives and continued on to Florida, where he was arrested after stealing another car. In the meantime, appellant's nephew was arrested for possession of cocaine left by appellant in the victim's car.

Houston police officer David Null interviewed appellant at the Marion County, Florida jail. Null testified that he advised appellant of all the warnings required by Article 38.22. After each warning, he asked appellant whether he understood the warning, and appellant answered affirmatively each time. Null then asked whether appellant wished to give up those rights, and appellant stated that "he wanted to clear things up." Null testified that he never made any promises to appellant, never offered appellant anything in exchange for talking about the murder case,

---

1. TEX. PEN. CODE § 19.03(a).

2. Art. 37.071, § 2(g). Unless otherwise indicated, all references to Articles are to the Texas Code of Criminal Procedure.

3. Art. 37.071, § 2(h).

4. Appellant argued these two points of error together in his brief, and we address them jointly here.

and never threatened appellant or any member of appellant's family. Regarding appellant's nephew, Null testified that he was aware that the nephew had been caught in a stolen car, but did not offer anything to the nephew in exchange for a statement in the case. Null said that appellant did say that there had been dope in the car and that the dope belonged to appellant and not to the nephew. When asked whether he offered to help the nephew in any way, Null testified: "I told him [appellant] that if the dope was his and he wanted to admit the dope was his that I would let the people know that he was admitting that the dope, it was his dope." Null also testified that appellant never asked for an attorney.

Appellant testified that, when Null said he wanted to ask some questions, "I asked him if I needed a lawyer." According to appellant, Null ignored his question. Appellant also testified that he had earlier asked a magistrate at extradition proceedings "if I could get a lawyer." With regard to his nephew, appellant testified that he told Null about his nephew's situation and asked "if they could get that took care of." According to appellant, Null replied that "he'd see what he could do." Appellant testified that he understood that answer to mean "[t]hat he, if I cooperated with him, he would help me out."

At the end of the suppression hearing, the trial court found:

> There is no credible evidence to indicate that the defendant was ever promised anything to make this statement. The credible evidence shows that the defendant never asked for a lawyer, that he waived his rights and freely and voluntarily gave the statement to Officer Null.

## 2. *Analysis*

In reviewing a trial court's ruling on a motion to suppress, the appellate court should afford almost total deference to the trial court's determination of the historical facts, especially when that determination involves an evaluation of the credibility and demeanor of witnesses.[5] With respect to both of appellant's claims, the trial court was free to believe Officer Null's testimony and disbelieve appellant's testimony.

With regard to whether an impermissible promise was made, Officer Null stated that he simply told appellant, if the drugs belonged to him and he wanted to admit to that, Null would pass along that admission. In *Martinez v. State*,[6] we addressed a similar situation. In that case, the police detective testified that he told the defendant that he needed to know who the drugs belonged to, and from that the defendant "could have gathered" that his father and brother would not be charged if the defendant "accepted responsibility."[7] We held that "the evidence supports the implied finding that no positive promise was ever made by the detective" to the defendant.[8] In the present case, the police officer's statements were even more circumspect because he simply indicated that he was willing to pass along any information the defendant wanted to convey. No positive promise was made. Moreover, the evidence suggests that appellant initiated the

---

**5.** *Maldonado v. State*, 998 S.W.2d 239, 247 (Tex.Crim.App.1999)(citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997) and applying its standard to a "promise" claim); *Ripkowski v. State*, 61 S.W.3d 378, 381–382 (Tex.Crim.App.2001), *cert. denied*, 539 U.S. 916, 123 S.Ct. 2274, 156 L.Ed.2d 133 (2003)(applying *Guzman* standard to *Miranda* claims).

**6.** 127 S.W.3d 792 (Tex.Crim.App.2004).

**7.** *Id.* at 793.

**8.** *Id.* at 795.

discussion regarding helping his nephew. "Having cast himself in the role of entrepreneur, [appellant] cannot expect an appellate court to find implied 'promises' in official responses (to his overtures) that are ambiguous at best." [9]

■■■ Regarding appellant's claim that he requested counsel, the trial court was within its discretion to believe Null's testimony that no counsel was requested. Appellant contends, however, that the trial court had no discretion to disbelieve appellant's testimony about requesting counsel before the magistrate because the State never controverted that testimony. But the trial court has discretion to disbelieve testimony even if it is not controverted.[10] The trial court did in fact discount appellant's testimony and was within its discretion to do so. Points of error two and three are overruled.

## B. Lesser-included offense

■■■ In point of error one, appellant contends that the trial court erred in refusing to submit his requested instruction regarding the lesser-included offense of criminally negligent homicide. At trial, appellant testified that he met the victim at a "hustler bar," went home with him, and engaged in consensual sexual conduct with him. According to appellant, the victim requested that appellant perform a "sleeper hold" to enhance the quality of the victim's sexual experience. Although the "sleeper hold" resulted in the victim's

death, appellant testified that this result was unintended.

■■■ Assuming, without deciding, that appellant was entitled to the requested instruction, we find any error to be harmless. The jury was instructed on the lesser-included offense of manslaughter.[11] We held in *Saunders v. State* that the jury's failure to find an intervening lesser-included offense (one that is between the requested lesser offense and the offense charged) may, in appropriate circumstances, render a failure to submit the requested lesser offense harmless.[12] This is so because the harm from denying a lesser offense instruction stems from the potential to place the jury in the dilemma of convicting for a greater offense in which the jury has reasonable doubt or releasing entirely from criminal liability a person the jury is convinced is a wrongdoer.[13] The intervening lesser offense is an available compromise, giving the jury the ability to hold the wrongdoer accountable without having to find him guilty of the charged (greater) offense.[14] While the existence of an instruction regarding an intervening lesser offense (such as manslaughter interposed between murder and criminally negligent homicide) does not automatically foreclose harm—because in some circumstances that intervening lesser offense may be the least plausible theory under the evidence [15]—a court can conclude that the intervening offense instruction renders the error harmless if the jury's rejection of that offense indicates that the jury legiti-

---

9. *Johnson v. State,* 68 S.W.3d 644, 654–655 (Tex.Crim.App.2002)(quoting *Henderson v. State,* 962 S.W.2d 544, 564 (Tex.Crim.App. 1997), *cert. denied,* 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 357 (1998))(bracketed material inserted, other brackets deleted).

10. *State v. Ross,* 32 S.W.3d 853, 855 (Tex. Crim.App.2000).

11. The jury was also instructed on the lesser-included offenses of murder, robbery, and aggravated assault.

12. 913 S.W.2d 564, 572 (Tex.Crim.App.1995).

13. *Id.*

14. *Id.*

15. *Id.* at 573.

mately believed that the defendant was guilty of the greater, charged offense.[16]

In *Saunders,* the defendant was charged with murder by squeezing a baby's head with intent to cause serious bodily injury.[17] The trial court denied the defendant's request to include in the jury charge an instruction on criminally negligent homicide but did include an instruction on "involuntary manslaughter"[18] (now known simply as "manslaughter").[19] The basic difference between (involuntary) manslaughter and criminally negligent homicide was (and is) that "in the former, that actor recognizes the risk of death and consciously disregards it, while in the latter he is not, but ought to be, aware of the risk that death will result from his conduct."[20] We found significant evidence in the record that the defendant was aware of the risk of death,[21] and therefore, manslaughter was a realistic option for the jury.[22] Consequently, the jury's conviction of the defendant for murder, despite the availability of involuntary manslaughter, indicated that the jury did in fact believe that the defendant harbored the specific intent required for the charged offense.[23]

Like the defendant in *Saunders,* appellant was denied an instruction on criminally negligent homicide but received an instruction on manslaughter. In addition, the record in the present case also contains significant evidence of appellant's awareness of the risk of death. On the witness stand, appellant testified that he initially refused the victim's request to ap-

ply a "sleeper hold" because doing so "scares" him. He testified that he had performed such a hold before, and he testified that he knew just by looking at the victim after he performed the "sleeper hold" that the victim was dead. Under the circumstances, if the jury truly believed that appellant performed a "sleeper hold" as a sexual maneuver and did not intend to kill the victim, the jury could easily have given effect to that belief by acquitting appellant of capital murder and convicting him of manslaughter. That the jury chose not to do so shows that it did not believe appellant's story. We conclude that any error was harmless. Point of error one is overruled.

## II. PUNISHMENT

### A. Sufficiency of the evidence—future dangerousness

■ In point of error five, appellant contends that the evidence is legally insufficient to support the jury's answer to the "future dangerousness" special issue[24] because, due to his testimony that he would attempt to commit criminal acts of violence in the future, prison authorities would not allow him to do so in prison and parole authorities would refuse to ever authorize his release.

During direct examination at the punishment phase of trial, appellant testified:

[L]ike [the prosecutor] told 'em from the beginning when they were picking the

16. *Id.* at 574.

17. *Id.* at 566.

18. *Id.* at 565–566.

19. *See* Acts 1993, 73rd Leg., ch. 900, § 1.01.

20. *Saunders,* 913 S.W.2d at 565.

21. *Id.* at 573–574.

22. *Id.* at 573.

23. *Id.* at 574.

24. The issue asks: "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071, § 2(b)(1).

jury, they have to answer two questions, am I going to be a future danger? Am I going to protect myself by any means necessary? Yes I am. That makes me a future danger, yes, I am. Second issue, is there any mitigating circumstance. I don't think so. Everybody lives and dies by the choices that they make. None of my family out there could control what I did. I did what I did because I wanted to do it, not because they made me do it, or because I got my ass whooped. I got my ass whooped because I deserved it a lot of times. Sometimes I got my ass whooped because I didn't deserve it but most of the time I—I did something wrong, I got punished for it. So whatever your decision is, I accept that. You found me guilty, you must believe I'm guilty. And if you send me to prison, for life, the chances are, in the Texas Department of Corrections the chances are I'm going to have to defend myself, and like I said, I will defend myself, whether it's against a guard or inmate or anybody else by any means necessary. If that means a guard puts his hands on me I'm going to put my hands on him. If a[n] inmate comes up to me with a knife and tries to stab me, I'm going to stab him or do whatever it takes to save my life from him.

Later, on cross-examination, the following transpired:

Q. You mentioned that you wanted—you think the jury should answer the special issues in such a way that you get the death penalty, right?

A. If they're following the law, yes.

Q. They have to, right?

A. Yes, if they're following the law, yes.

Q. Because it's clear you're a future danger, right?

A. If it's—if me protecting myself or my property, yes, I'm a future danger.

Q. And you would do whatever it takes, be it hurt another inmate, hurt another guard, to prove that, right?

A. Not necessarily, but if that arises, yes I will, and I'm sure within 40 years, it will arise sometimes.

Q. You're positive there's no way you could stay in prison probably even for a year without getting violent again, right?

A. Probably not. Probably not even a month.

In his brief, appellant argues that the evidence clearly showed that he is a danger to both prison and free society:

From the evidence of the primary offense against Shane Honeycutt, the offense against Steven and evidence at punishment about Appellant's commission of threats and violence against others in the free world, the jury must have drawn the conclusion that Appellant presented a real danger, a threat to people in free society. The testimony of jail personnel about Appellant's violent conduct toward others in the county jail, including fighting with other inmates and including verbal threats to one deputy, about his membership in the Aryan Brotherhood gang (a gang which was also present in the Texas prison system, according to a deputy witness) and his readiness to defend the Brotherhood against "disrespect" with violence. Together with Appellant's own testimony that he would continue to commit criminal acts of violence in prison whenever he deemed it necessary (which he told the prosecutor he believed would probably occur "within a month") was certainly evidence relevant to the jury's decision about the likelihood of Appellant's being a continuing threat to prison society. Appellant's feelings of remorse, or even regret, for any of his violence to-

ward others were remarkable for their absence; for example, Officer Null, who took Appellant's tape recorded statement, testified at guilt that Appellant told him that Honeycutt's death "didn't really matter to him, he didn't feel any remorse about it, he wasn't upset about it because he didn't know him—and it just didn't matter." At punishment, Deputy Urick said when he told Appellant in the jail that he would write him up for refusal to follow Urick's order to pick up his food tray, Appellant told him he would "choke you like I choke my victims." In short, the evidence was strongly suggestive that Appellant would be, and would strive to be a continuing threat both in prison and in free society, were he ever to get there.

Appellant argues that, given the obvious threat he poses, prison officials would place him in lockdown to protect guards and other inmates from him. In addition, appellant argues that the parole authorities would never parole such a dangerous person. He concludes that he does not in fact constitute a future danger because the authorities will act to neutralize his ability to threaten others.

Appellant's argument appears to be that he is so dangerous that he is not dangerous. His contention is ingenious but unpersuasive. If accepted, it would stand the capital punishment scheme on its head, giving relief to the most dangerous offenders. We will not speculate, for legal sufficiency purposes, about the effectiveness of the prison and parole authorities' methods of protecting society from those who are intent on committing future criminal acts of violence. Point of error five is overruled.

## B. Order of closing argument

■ In point of error four, appellant contends that the trial court erred in refusing his request to give the concluding argument in punishment on the mitigation special issue. Appellant contends that Article 36.07 does not govern capital cases, that the trial court has discretion to change the order of arguments in a capital case, that the State has no burden of proof on the mitigation issue and any burden that does exist is on the defendant, and that his constitutional rights were violated by the "psychological advantage" the State had "in making the last impression on the jury" in a death penalty case.

Article 36.07 provides: "The order of argument may be regulated by the presiding judge; but the State's counsel shall have the right to make the concluding address to the jury." Appellant contends that Article 36.07 does not apply to capital cases. His only reason for so concluding is the assertion that the procedure in capital cases is controlled by Article 37.071, and that article is silent as to the order of argument. However, the fact that Article 37.071 controls many aspects of capital punishment proceedings is not, by itself, sufficient to reject the applicability of a statute that, on its face, appears to apply to all criminal trials. And in fact, we have previously held that Article 36.07 applies to capital cases, including the punishment phase of a capital murder trial.[25] The State suggests that Article 36.07 may be preempted by the following sentence in Article 37.071: "The state and the defendant or defendant's counsel shall be permitted to present argument for or against

---

**25.** *Norris v. State,* 902 S.W.2d 428, 442 (Tex. Crim.App.), *cert. denied,* 516 U.S. 890, 116 S.Ct. 237, 133 L.Ed.2d 165 (1995); *see also Cherry v. State,* 488 S.W.2d 744, 757 (Tex.Crim.App.1972)(opinion on original submission), *cert. denied,* 411 U.S. 909, 93 S.Ct. 1538, 36 L.Ed.2d 199 (1973).

a sentence of death."[26] But that provision covers only the content of argument: the parties are permitted to explicitly argue for or against a "death sentence" rather than simply arguing the special issues. That situation is unique to death penalty cases, and thus, is understandably included in Article 37.071. Nothing in the Code of Criminal Procedure limits the application of Article 36.07 to non-capital cases and we see no reason to do so.

Appellant argues that, in civil cases, the final argument falls to the shoulders of whoever has the burden of proof. But we have held that Article 36.07, not the civil rules, applies to criminal cases.[27] In *Martinez v. State*, we rejected the defendant's claim that the issue of insanity gave him the right to open and close argument, even though insanity was the only contested issue in the case and one on which the defendant carried the burden of proof.[28] We held that the trial court's refusal to permit the defendant to open and close under those circumstances did not deprive the defendant of any constitutional right.[29] In a capital case, we have likewise rejected a defendant's claim that a trial court's failure to allow defense counsel to rebut the prosecutor's arguments rendered his trial fundamentally unfair.[30] We see nothing about the mitigation special issue, which imposes a burden of proof on neither party,[31] that distinguishes appellant's

situation from our prior holdings. Point of error four is overruled.

## C. Constitutionality of the death penalty

### 1. *Future dangerousness issue*

In point of error six, appellant contends that the future dangerousness issue is unconstitutional because the issue is not susceptible to proof beyond a reasonable doubt and cannot be applied fairly by the jury. He contends that a jury will tolerate no risk in determining whether the defendant constitutes a future danger to society. We have previously rejected this claim.[32]

### 2. *Failure to inform jurors of effect of hung jury*

In points of error seven and eight, appellant contends that his Eighth Amendment right against cruel and unusual punishments was violated by the trial court's refusal to inform the jurors that a failure to arrive at a unanimous verdict in favor of the State on the punishment issues would result in a life sentence. He acknowledges that the failure to so inform the jury is sanctioned by statute and challenges the constitutionality of the part of Article 37.071 that is often called the "12–10" rule. We have previously rejected such arguments.[33] Appellant relies upon the dissent in *Jones v. United States*,[34] but the dissent is just that—a dissent. Relying upon the

---

26. Art. 37.071, § 2(a)(1).

27. *Martinez v. State*, 501 S.W.2d 130, 131–132 (Tex.Crim.App.1973), *appeal dism'd*, 415 U.S. 970, 94 S.Ct. 1547, 39 L.Ed.2d 863 (1974); *Brown v. State*, 475 S.W.2d 938, 957 (Tex. Crim.App.1971).

28. 501 S.W.2d at 132.

29. *Id.*

30. *Norris*, 902 S.W.2d at 442.

31. *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex.Crim.App.2004).

32. *Resendiz v. State*, 112 S.W.3d 541, 546 (Tex.Crim.App.2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 2098, 158 L.Ed.2d 713 (2004).

33. *Escamilla*, 143 S.W.3d at 828; *Busby v. State*, 990 S.W.2d 263, 272 (Tex.Crim.App. 1999), *cert. denied*, 528 U.S. 1081, 120 S.Ct. 803, 145 L.Ed.2d 676 (2000).

34. 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

majority opinion in *Jones*, we have recognized that the Supreme Court has *found* that the Eighth Amendment does not require that jurors be informed of the effect of a failure to reach unanimous agreement on the punishment issues.[35] Points of error seven and eight are overruled.

The judgment of the trial court is affirmed.

---

35.  *Resendiz,* 112 S.W.3d at 549.