

# NUMBER 13-22-00436-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

EDUARDO CRUZ GONZALES,                                         Appellant,

v.

STATE OF TEXAS,                                                         Appellee.

## ON APPEAL FROM THE 93RD DISTRICT COURT
## OF HIDALGO COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Silva**
**Memorandum Opinion by Justice Longoria**

Appellant Eduardo Cruz Gonzales was found guilty of the murder of Adaly Tellez Johnson, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02. The trial court assessed punishment at fifty years' imprisonment. By three issues, which we reorganize and re-number, Eduardo argues (1) the evidence was insufficient and the State failed to

disprove self-defense, (2) the trial court erred in failing to submit the lesser-included offense of criminally negligent homicide, and (3) the trial court erred when it refused to include a self-defense instruction as applied to the lesser-included offense of manslaughter. We affirm.

## I. BACKGROUND[1]

Eduardo was indicted by a grand jury on one count of murder. *See id.* The indictment alleged that Eduardo "intentionally or knowingly cause[d] the death of . . . Johnson, by striking her with a cinder block." *See id.* § 19.02(b)(1). Alternatively, the indictment alleged that Eduardo "with intent to cause serious bodily injury to . . . Johnson, . . . committ[ed] an act clearly dangerous to human life, to wit: striking her with a cinder block, that caused the death of . . . Johnson." *See id.* § 19.02(b)(2).

On September 30, 2017, Mark Gonzalez, Eduardo's stepbrother, attended his sister's ballroom quinceañara celebration. Eduardo did not attend the quinceañara. Instead, Eduardo was with Johnson and her daughter at Johnson's residence in Penitas, Texas. According to Javier Solis, Johnson's neighbor, Solis and Eduardo drank some beers around 10:30 or 11:00 p.m. Solis testified that he went inside his house around midnight to eat and sleep and noted that Eduardo went back inside Johnson's house.

After the quinceañara, Mark and other family members went to the home of Juan Gonzalez Sr., Mark's father and Eduardo's stepfather, for an "after party." At some point, around 3:00 a.m., Eduardo arrived at Juan Sr.'s home with Johnson's daughter.

---

[1] We limit our recitation of the testimony elicited at trial to that which is necessary to resolve the issues presented on appeal. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

According to Mark's testimony, Eduardo appeared "a little bit drunk" and told him that "he had done something that he was going to regret" and that "he had killed [Johnson]." Mark testified that he did not initially believe Eduardo, was "a little bit in shock," and told Eduardo "[N]o, come on lets go eat [and] drink a beer." However, on cross-examination, Mark testified that Eduardo did not say that he killed Johnson but only that he had done something he was going to regret for the rest of his life. Juan Gonzalez Jr., Juan Sr.'s son and Mark's stepbrother, was also at the after party and testified that Eduardo had said that he had hurt Johnson.

During the after party, Eduardo, Mark, and Juan Sr. got into a verbal argument and fist fight because Eduardo thought Mark and Juan Sr. were talking bad about him. After the fight, Mark dropped off Eduardo at Mark's grandmother's house, went home, and fell asleep. Maria Maldonado, Mark's aunt, lived at Mark's grandmother's house with her husband Daniel. Maldonado testified that she saw Eduardo talking to Daniel later that morning, around 10:00 a.m. According to Maldonado, Eduardo stated that "he done [sic] a stupidity" and that he had killed Johnson.

On that same day, October 1, 2017, Mark woke up because Johnson's daughter was crying. Mark testified he thought that his wife Kimberly dropped off Johnson's daughter with Johnson's parents. Mark stated that he and Kimberly drove to Johnson's residence located in Penitas, Texas. According to Mark, he honked the horn of his truck, got out of the vehicle, and knocked on Johnson's door, but no one answered. Mark got back into his truck, and he and Kimberly decided to drive to the back of Johnson's home to access the "back roads." As they were leaving, Kimberly told Mark that she saw Johnson laying on the ground behind the house. Mark exited his truck and saw Johnson

3

laying on the ground, not moving. Mark then got back into his truck and called the police.

Jose Moya, a former deputy with the Hidalgo County Sheriff's Office (HCSO), testified that he arrived at Johnson's residence after receiving a 911 call regarding a downed subject. Upon arrival, Moya overheard Mark advise another deputy that there was a subject laying in the grass behind the house. Moya observed that the residence did not have a fence, and he walked around the perimeter of the property until he came across Johnson's lifeless body, face-down in the grass. Johnson was wearing a striped shirt, blue jeans, and had a rope around her right leg. Her body looked bloated, as if it was starting to decompose. According to Moya, the back of Johnson's skull looked like it had been hit "pretty hard," had a "bald spot" the size of his hand that appeared to be "pushed in," and a "big portion" of her hair was missing. Regarding her right arm, Moya stated that there was just bone and no skin from just below her shoulder all the way down to just above where Johnson's wrist would have been, and he did not see Johnson's hand.

HCSO Investigator Eduardo Aleman testified that he arrived at Johnson's residence around 5:30 p.m. and did a "walk-through" of the scene. Numerous photos of the scene were admitted into evidence. Aleman stated that he saw a big pool of blood on dirt a few feet from a PVC pipe which ran from the house to the back of the property. The pipe itself had blood on it and Aleman found a sandal and a cellphone around the area. Aleman also stated that the ground appeared as if something heavy was dragged because there were "drag marks" which constituted a trail of sorts. The trail curved from the back of the property to the grassy area where Johnson's body was found. Along the trail, Aleman observed a white five-gallon bucket that contained a cinder block inside. The

4

cinder block was covered in blood and hair and weighed thirty-three pounds. Nearby, a gray shirt was found in a "burn pit," an area where various items appeared to have been previously set on fire. The front of the shirt was bloody, but the back of the shirt was unstained. Aleman also observed that there were "blots" of bloody human hair on the ground throughout the trail. Though a search was conducted at the scene, Aleman stated that investigators did not recover Johnson's hand or the missing flesh from her arm.

HCSO Investigator Frank Medrano testified that a knife was found in a barbeque pit area, which Medrano stated was around fifteen to twenty-five feet away from the blood-stained PVC pipe. Medrano stated "[t]hat pipe is on the north side area of the residen[ce,] and the barbecue pit was more on the South side[,] so you []have to cross that lawn . . . to get to the barbecue pit." A search warrant for the house was obtained and executed. HCSO Investigator Sandra Rangel testified that she swabbed a shower handle and drain inside the house for DNA and both items tested positive for the presence of presumptive blood.

HCSO Investigators Hermelinda Chavez and Miguel Lopez learned that Eduardo had told other people that something had happened to Johnson and interviewed Eduardo on October 2, 2017, around 10:00 a.m. Eduardo was read his *Miranda* rights, waived them, and confessed to killing Johnson. A video recording and written transcript of this interview were admitted into evidence without objection.[2] During the interview, Eduardo stated that he and Johnson were both drunk and that he had gone to buy beer at a drive

---

[2] The video recording of the interview was not designated as part of the appellate record. In addition, the transcript indicates that portions of the interview that were in Spanish were translated into English by a transcriptionist.

thru before it closed at midnight. Eduardo was drinking a beer with Johnson's neighbor when Johnson left with her daughter in her SUV and drove through "the caliche road in the back." Johnson's neighbor asked Eduardo where Johnson was going, so Eduardo called her and asked. According to Eduardo, Johnson stated that she was putting her daughter to sleep. Eduardo then stated that Johnson returned after a short time, was "hysterical," told him she no longer loved him, that she had been talking to someone else, and that she did not want him in her home anymore. Eduardo stated that Johnson had a knife in her hand, and he asked her "what the [expletive] is in your hand?" Eduardo explained that he had used the knife to cut meat earlier that day because he had grilled some steaks. According to Eduardo, Johnson stated that she did not know why he came back, as she and Eduardo had broken up "again" a week before. Eduardo then told Lopez that he could no longer "hold in the rage." Eduardo said, "[W]e fought but, well, I didn't [sic] it was going to escalate to something else." Eduardo explained that Johnson tried to stab him, and that he and Johnson physically struggled near the PVC pipe. Eduardo further stated that he pushed Johnson, that she fell and hit herself, "I guess on the [cinder] block." Eduardo also stated that he had heard a "blow" at the time. Lopez then stated "Okay. But her wound is pretty big. It's bad on the back. So, she fell, or did you hit he[r] with the block?" Eduardo responded, "Hit her with the block." When asked whether Johnson was on the ground or standing up when he hit her with a cement block to the head, Eduardo responded "No, she was already on the ground" and stated that she was "face[-]down, I think."

Eduardo then stated that Johnson did not move, that he did not feel a pulse on her, and that she had died. Eduardo then explained that he opened the truck, drank another

6

beer, smoked a cigarette, and cried. Eduardo stated that he tied rope on her and dragged her to the ditch and left her face-down. When asked about her missing arm, Eduardo denied having caused that. The following exchange occurred:

[Lopez]:                  So, you didn't do any other injuries?

[Eduardo]:               No, no.

[Lopez]:                  Other than that thing with the block?

[Eduardo]:               Yeah.

[Lopez]:                  And you dragged her over there.

[Eduardo]:               . . . I mean, hitting each other.

[Lopez]:                  Right, right. Okay.

[Eduardo]:               But that with her arm, no.

When asked what he did with the bloody shirt he was wearing, Eduardo indicated it "stayed on the ground." When asked why he dragged Johnson's body into the ditch, Eduardo stated that he was scared that someone would pass by and see her in the morning, that he "already knew sooner or later" that he was "going to get locked up," "[b]ut it wasn't intentionally. I mean, it wasn't on purpose." The following exchange occurred regarding the knife:

[Lopez]:                  Let me ask you this, when you get into the blows, right, she's fighting with you and this and that. What happened with the knife?

[Eduardo]:               [Expletive]. I don't even remember.

[Lopez]:                  You don't remember?

[Eduardo]:               Mmm mmm.

[Lopez]:                  Because from where she was at the pool of

7

|  |  |
|---|---|
|  | blood where we find [sic], the knife we found way over here. |
| [Eduardo]: | Over there by the PVC, right? |
| [Lopez]: | Well, no, the knife we found away from the PVC. Because the PVC is where we found all the blood. |
| [Eduardo]: | Mmm hmm. |
| [Lopez]: | The knife we found away from that. Were you able to take away the knife from her when you guys were fighting or did she throw the knife or . . . . |
| [Eduardo]: | I don't know. I don't remember. All I know is she had the knife on her and, well, I too, I mean . . . . |
| [Lopez]: | Well, when you hit her with the cement, did she have the knife with her or not? |
| [Eduardo]: | No. |
| [Lopez]: | No? She didn't have it anymore? So, you don't know what happened in that span? What is it that happened with the knife? |
| [Eduardo]: | I do not know. |
| . . . . |  |
| [Lopez]: | Do you remember if you stabbed her at all with the knife that she had? |
| [Eduardo]: | No. |
| [Lopez]: | No? Okay. So, there were only blows? |
| [Eduardo]: | Yes, just blows. |
| [Lopez]: | And then when she was down you hit her with the block. |
| [Eduardo]: | Block. |

8

| [Lopez]: | Right, right. Okay. |
|---|---|
| [Eduardo]: | But that with her arm, no. |

Eduardo stated that after he dragged Johnson, he took a shower because he was covered in blood and then left to his stepfather's house with Johnson's daughter, who had been asleep in the car. Eduardo said that he had told Mark that he did not know if he had killed Johnson, and Mark did not believe him, and that they then went back to where everyone was sitting. Eduardo admitted he had told Daniel that he had killed Johnson when Daniel had asked Eduardo whether he beat her up. Eduardo also indicated that Johnson had previously tried to stab him in front of his three-year old son, and that she had admitted that she once stabbed an ex-boyfriend with a screwdriver. Eduardo was arrested after providing his statement.

Dr. Norma Jean Farley testified that she conducted Johnson's autopsy. Dr. Farley's written autopsy report and numerous photos taken during the autopsy were admitted into evidence. Dr. Farley stated that Johnson had a depressed fracture in the back of her skull which measured 9 cm by 4.4 cm and contained no hair. Dr. Farley also testified that several pieces of bone separated due to the fracture and had fallen into the cranial vault, which caused lacerations and blood accumulation in the brain. Dr. Farley stated that she had observed similar blood accumulation of brains in persons involved in motor vehicle and motorcycle accidents. Dr. Farley opined that Johnson's skull injury was due to a significant strike and thought it involved the use of an instrument. In addition, Johnson had a scrape on her chin, as well as bruises on her eyes, left cheek, and the inside of her lips. Dr. Farley opined that several punches caused those injuries. Dr. Farley

9

also noted the presence of bruises on the left and right side of Johnson's neck.

Regarding Johnson's right arm, Dr. Farley stated that it contained a probable incised wound, or stab injury, and opined that animals had probably started chewing on it.[3] Johnson had nine non-lethal sharp force injuries, including a cut on the bridge of her nose. Dr. Farley stated that some of the sharp force injuries could have been "animal activity." Dr. Farley concluded that Johnson's cause of death was blunt force head trauma with shock force injuries and that the manner of death was homicide. She explained that she could not rule out Johnson's arm injury as a cause. Dr. Farley thought the head injury was caused by a single strike but could not rule out multiple strikes. She indicated that the possible cause of Johnson's head injury could have involved "something actually hitting her" head or that her head was "smashed into something." Dr. Farley also stated that she could tell Johnson had been dragged because there were abrasions on the front of her body and no blood. Toxicology testing revealed that Johnson had a blood alcohol level of 0.127. Dr. Farley stated that those results could have been due to alcohol consumption in part or decomposition in part but could not say how much either way.

Eduardo testified in his own defense. Much of his testimony related to Johnson's actions and behavior during their relationship, which Eduardo described as a "roller coaster." Regarding his statement to police, Eduardo testified that he did not understand the warnings given to him by Lopez, but nevertheless stated that everything he told the police was the truth. Eduardo stated that the fight with Johnson started when she told him that she did not love him anymore, did not want him in the house anymore, and that she

---

[3] Dr. Farley explained that animals are often attracted to blood or injuries and start eating there, especially dogs, coyotes, and even house cats.

10

was talking to someone else. According to Eduardo, Johnson sounded angry and hysterical and she had a knife in her right hand. Johnson pointed the knife at him and came towards him with the knife. Eduardo testified he felt threatened and that they started fist fighting, and that he was defending himself the "whole time." Eduardo stated that he pushed Johnson and that they both fell. Eduardo explained that when they fell, Johnson was facing up and he was facing down, that she pulled him with her as she fell, that he had fallen on top of her, and that is why she hit her head on the cinder block. Eduardo stated that he had not seen the cinder block when they started fighting and only saw it after the fight. Eduardo stated that he did not pick up the cinder block and strike Johnson in the back of the head.

In addition, Eduardo testified that he never got the knife away from Johnson or stabbed her, and that she got cut because she swung the knife as they fought. When asked why he did not correct Lopez when Lopez asked if Eduardo hit Johnson with the block or she fell, Eduardo stated that he was not paying attention because he was explaining to them what happened or how it happened, and the investigators were always cutting him off. Eduardo admitted that his testimony was different from his statements to the HCSO investigators, and said "I'm trying to explain myself[,] maybe I didn't do it there at the time cause one I was stressed out, traumatize[d.] I mean[,] another [sic] I just got beaten up by McAllen P.D." Eduardo also testified that he did not call police after Johnson died because he was not thinking.

After both parties rested, the trial court conducted a jury charge conference outside the presence of the jury. Eduardo requested that the jury charge include an instruction for criminally negligent homicide as a lesser-included offense of murder, which was denied

11

by the trial court. However, the jury charge included an instruction for the jury to consider the lesser-included offense of manslaughter. The trial court also granted Eduardo's request for an alternate manner and means as applied to the manslaughter instruction. Eduardo made no other objections to the charge. After hearing closing arguments from the parties, the jury found Eduardo guilty of murder. After the presentation of punishment evidence, the trial court sentenced Eduardo to fifty years' imprisonment. This appeal followed.

## II.     SUFFICIENCY

In his first issue, Eduardo argues that the evidence was legally insufficient to support his murder conviction or the jury's rejection of his self-defense claim.

## A.     Standard of Review & Applicable Law

In determining the sufficiency of the evidence to support a criminal conviction, we consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found that the State proved the essential elements of the crime beyond a reasonable doubt. *Baltimore v. State*, 689 S.W.3d 331, 341 (Tex. Crim. App. 2024) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010).

"We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge." *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's

theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

A hypothetically correct charge in this case would instruct the jury that Eduardo is guilty of murder if he (1) intentionally or knowingly caused the death of Johnson, or (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Johnson's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1)–(2). It would also instruct the jury that a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). A "reasonable belief" in this context is defined as one "that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

A person is justified in using *deadly* force against another under § 9.31 "when and to the degree the [person] reasonably believes the deadly force is immediately necessary . . . to protect the [person] against the other's use or attempted use of unlawful deadly force." *Id.* §§ 9.31(a); 9.32(a)(2)(A); *Rogers v. State*, 664 S.W.3d 843, 851–52 (Tex. Crim. App. 2022) ("Section 9.31 lays out the standard for the use of force in self-defense. However, the use of deadly force in defense of a person is governed by [§] 9.32."). "The [Texas] Penal Code does not require that a defendant intend the death of an attacker in order to be justified in using deadly force in self-defense." *Alonzo v. State*, 353 S.W.3d 778, 783 (Tex. Crim. App. 2011). However, the defendant bears the burden to produce some evidence in support of his claim to be entitled to a self-defense instruction. *Braughton*, 569 S.W.3d at 608 ("The defendant's burden of production

13

requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue."). Once the defendant produces that evidence, the State then bears the burden of persuasion to disprove the raised defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). "[T]he State's burden of persuasion 'is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt.'" *Braughton*, 569 S.W.3d at 608 (quoting *Zuliani*, 97 S.W.3d at 594).

Finally, a hypothetically correct charge would also instruct the jury that self-defense is not available to Eduardo if Eduardo provoked Johnson's use of unlawful force, unless: (1) Eduardo abandoned the encounter, or clearly communicated to Johnson his intent to do so reasonably believing he could not safely abandon the encounter; and (2) Johnson nevertheless continued or attempted to use unlawful force against Eduardo. TEX. PENAL CODE ANN. § 9.31(b)(4); *see Elizondo v. State*, 487 S.W.3d 185, 196 (Tex. Crim. App. 2016) ("The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense.").

In reviewing the sufficiency of the evidence when a jury has rejected a claim of self-defense, in addition to considering the essential elements of the offense, we must determine, after viewing all the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

"As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder." *Braughton*, 569 S.W.3d at 608; *Brooks*, 323 S.W.3d at 899 (providing that a reviewing court must not sit as "thirteenth juror," disagree with the jury's "weighing of the evidence," or "disagree with a jury's resolution of conflicting evidence"). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Braughton*, 569 S.W.3d at 608; *Brooks*, 323 S.W.3d at 922. "Although the parties may disagree about the logical inferences that flow from undisputed facts, where there are two permissible views of the evidence, the fact[]finder's choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (cleaned up).

## B.    Discussion

By finding Eduardo guilty of murder, the jury necessarily rejected his proposed self-defense claim. *See Rogers*, 664 S.W.3d at 850, n.32; *Braughton*, 569 S.W.3d at 611; *Saxton*, 804 S.W.2d at 913–14 (noting that the assessment of defensive evidence is "solely within the jury's province and the jury is free to accept or reject the defensive evidence"). The record supports that finding.

In this case, multiple witnesses testified that Eduardo had stated that he had hurt or killed Johnson in the hours after he had left the crime scene, including Mark, Juan Jr., and Maldonado.[4] Dr. Farley opined that Johnson's depressed fractured skull injury was due to a significant strike and involved the use of an instrument. She also stated that

---

[4] We note that none of these witnesses testified that Eduardo had stated he had been defending himself, that he had been attacked by Johnson, or that Johnson had a knife.

15

Johnson's head could have been taken and smashed into something. Dr. Farley concluded that Johnson's cause of death was blunt force head trauma with shock force injuries and that the manner of death was homicide. At the crime scene, investigators found a thirty-three-pound cinder block covered in blood and hair inside of a five-gallon bucket.[5] Investigators also found a grey shirt near a "burn pit" that was covered in blood in the front.

During his interview with investigators, Eduardo initially stated that Johnson tried to stab him, and that he and Johnson physically struggled near the PVC pipe. Eduardo further stated that he pushed Johnson, that she fell and hit herself, "I guess on the [cinder ]block." However, when Lopez stated, "Okay. But her wound is pretty big. It's bad on the back. So, she fell, or did you hit he[r] with the block," Eduardo responded, "Hit her with the block." When asked whether Johnson was on the ground or standing up when he hit her with a cement block to the head, Eduardo responded "No, she was already on the ground" and that she was "face[-]down, I think." When asked if Johnson had the knife when he hit her with the cinder block, Eduardo responded no. Investigators did not find the knife in the area of the blood-stained PVC pipe, where a large pool of blood was on the ground nearby. Instead, the knife was found in a barbeque pit area, which was around fifteen to twenty-five feet away from the PVC pipe.

During trial, Eduardo's testimony echoed his statements to investigators that Johnson came at him with a knife. However, his testimony differed in that he firmly stated that he did not pick up the cinder block and strike Johnson in the back of the head. Instead,

---

[5] There was no testimony in the record explaining how the bloody cinder block got inside the bucket.

16

Eduardo testified that Johnson hit her head on the cinder block after he pushed her during the fight and they both fell. Eduardo testified that he had not seen the cinder block when they started fighting, and only saw it after the fight. In addition, Eduardo testified he did not stab Johnson and that she was cut because she swung the knife as they fought. Eduardo testified that he did not correct Lopez's impression that Eduardo used the cinder block to hit Johnson because he was not paying attention as he was explaining to them what happened or how it happened and that the investigators were always cutting him off from speaking. Eduardo admitted that his trial testimony was different from his statements to investigators and stated that he was trying to explain himself. Eduardo also suggested that he had not explained himself at the time of the interview because he was "stressed out, traumatize[d]," and had "just got beaten up by McAllen P.D."

Although Eduardo recanted his prior statements at trial, "it is up to the fact[]finder to determine whether to believe the original statement or the recantation." *Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi–Edinburg 2008, pet. ref'd) (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). Despite hearing conflicting versions of what happened the evening of Johnson's death, the jury was the sole judge of witness credibility on this issue, and we accept the jury's resolution of conflicts in favor of the verdict. *See Braughton*, 569 S.W.3d at 610 ("[I]t is apparent that appellant's defensive claims hinged almost entirely on the credibility of the witnesses who viewed the events. Given this fact, it would have been improper for the court of appeals to apply its own view of the weight and credibility of the witness testimony, thereby substituting its own view for that of the jury."); *Evans*, 202 S.W.3d at 163; *Saxton*, 804 S.W.2d at 913. Specifically, a rational juror could have disbelieved Eduardo's statements

17

to investigators and his testimony that Johnson came at him with a knife, and it could have found against Eduardo on the self-defense issue beyond a reasonable doubt for that reason. *See Saxton*, 804 S.W.2d at 914. Furthermore, the jury could have inferred that his acts in dragging Johnson's body to a grassy area so that no persons passing by would see her and his subsequent flight from the crime scene was indicative of his consciousness of guilt. *See Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014) ("Applicant's attempts to conceal Jerry's body and his implausible explanations to police are strong evidence of applicant's consciousness of guilt."); *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) (holding that flight evidences a consciousness of guilt). Thus, the evidence is sufficient to support the jury's rejection of Eduardo's self-defense claim. We overrule Eduardo's first issue.

### III.    JURY CHARGE ERROR

In his second issue, Eduardo argues that the trial court erred when it denied his request for the lesser-included offense of criminal negligent homicide in the jury charge. In his third issue, Eduardo argues that the trial court egregiously erred when it failed to include a self-defense instruction as to the lesser-included offense of manslaughter in the jury charge. We address these issues together.

### A.    Standard of Review & Applicable Law

"[T]he jury is the exclusive judge of the facts," but the trial court submits a charge to the jury "distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. arts. 36.13, 36.14. The charge is meant to inform the jury of the applicable law and how to apply it to the facts of the case. *Alcoser v. State*, 663 S.W.3d 160, 164–65 (Tex. Crim. App. 2022) (citing *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)).

A jury-charge-claim analysis involves two steps: First, we determine whether the charge is erroneous. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013); *see Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). If it is, then we must decide whether the appellant was harmed by the erroneous charge. *Wooten*, 400 S.W.3d at 606; *Ngo*, 175 S.W.3d at 744. There are two standards of review for jury-charge-error claims. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). If a defendant timely objects to alleged jury-charge error, the record need only show "some harm" to obtain relief. *Id.* If there was not a timely objection, the record must show "egregious harm." *Id.* Harm is assessed "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of [the] probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Id.* An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory. *Id.* A finding of egregious harm must be based on "actual rather than theoretical harm." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). Egregious harm is a difficult standard to meet, and the analysis is a fact-specific one. *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). Neither party bears the burden to show harm. *Marshall v. State*, 479 S.W.3d 840, 842–43 (Tex. Crim. App. 2016).

**B.      Discussion**

**1.      Lesser-Included Instruction of Criminally Negligent Homicide**

A two-step test exists for determining whether a trial court is required to give an instruction on a lesser-included offense. *See Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011).

The first step is to determine whether the requested instruction pertains to an offense that is a lesser-included offense of the charged offense, which is a matter of law. *Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim. App. 2016) (citing *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007)). Under this first step of the test, an offense is a lesser-included offense if it is within the proof necessary to establish the offense charged. *Id.* (citing *Sweed*, 351 S.W.3d at 68); *see also* TEX. CODE CRIM. PROC. ANN. art. 37.09. In this case, the first step is satisfied because, as a matter of law, criminally negligent homicide is a lesser-included offense of murder. *See Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992).

The second step in the analysis asks whether there is evidence in the record that supports giving the instruction to the jury. *Bullock*, 509 S.W.3d at 924–25 (citing *Sweed,* 351 S.W.3d at 68). Under this second step, a defendant is entitled to an instruction on a lesser-included offense when there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *Id.* at 925 (citing *Rice v. State*, 333 S.W.3d 140, 145 (Tex. Crim. App. 2011)). The evidence must establish that the lesser-included offense is a valid, rational alternative to the charged offense. *Id.* (citing Rice, 333 S.W.3d at 145)).

Criminally negligent homicide involves causing the death of another by criminal negligence. TEX. PENAL CODE ANN. § 19.05(a). The Texas Penal Code defines criminal negligence as:

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross

deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(d).

Criminal negligence involves inattentive risk creation. *Lugo v. State*, 667 S.W.2d 144, 147–48 (Tex. Crim. App. 1984); *Lewis v. State,* 529 S.W.2d 550, 553 (Tex. Crim. App. 1975). The key to criminal negligence is the failure of the actor to perceive the risk created by his conduct. *Trujillo v. State*, 227 S.W.3d 164, 168 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). Before a charge on criminally negligent homicide is required, the record must contain evidence showing an unawareness of the risk. *Jackson v. State*, 248 S.W.3d 369, 371–72 (Tex. App.—Houston [1st Dist.] 2007, pet ref'd.) (citing *Mendieta v. State*, 706 S.W.2d 651, 653 (Tex. Crim. App. 1986)).

While we are cognizant that Eduardo's version of the facts characterizes Johnson's death as accidental, even assuming he was entitled to the instruction on criminally negligent homicide, the review of the record does not show that Eduardo suffered "some harm." *See Almanza*, 686 S.W.2d at 171.

The Texas Court of Criminal Appeals has held that a jury's failure to find a defendant guilty of an intervening lesser-included offense—an offense between the requested lesser-included offense and the charged offense—can render the trial court's failure to give the requested charge harmless. *See Braughton*, 569 S.W.3d at 617; *Masterson v. State*, 155 S.W.3d 167, 171 (Tex. Crim. App. 2005); *Saunders v. State*, 913 S.W.2d 564, 573–74 (Tex. Crim. App. 1995). The harm from denying a lesser-included offense instruction stems from the potential to "place the jury in the dilemma of convicting for a greater offense in which the jury has reasonable doubt or releasing entirely from

21

criminal liability a person the jury is convinced is a wrongdoer." *Masterson*, 155 S.W.3d at 171. Such a concern is not present in situations where another charged offense presents the jury with an available compromise, giving the jury the ability to hold the wrongdoer accountable without having to find him guilty of the greater offense. *Id.*

In this case, the jury received instructions on murder and manslaughter. Manslaughter requires proof of a less culpable mental state than murder—reckless[6] versus intentional or knowing, respectively—and criminally negligent homicide requires proof of criminal negligence, which is a less culpable mental state than manslaughter. *See* TEX. PENAL CODE ANN. §§ 6.03(a), (c), (d); 19.02(b)(1)–(2); 19.04(a); 19.05(a). Under these circumstances, this makes manslaughter an intervening lesser-included offense.

By receiving instructions on murder and manslaughter, the jury was not faced with an all-or-nothing dilemma under which it was forced to consider convicting Eduardo of an offense for which it had reasonable doubt. *See Masterson*, 155 S.W.3d at 171. Further, the jury's decision to convict Eduardo of murder, the greater charged offense, despite the availability of manslaughter, shows that it believed that Eduardo possessed the specific intent required for murder.[7] That the jury concluded Eduardo intentionally, rather than

---

[6] The Texas Penal Code defines reckless as:

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE ANN. § 6.03(c).

[7] As noted above, the charge provided the jury with the option to convict Eduardo of murder if it found beyond a reasonable doubt that Eduardo: intentionally or knowingly caused the death of Johnson, or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused

recklessly, caused Johnson's death is a clear indication that it would not have concluded he negligently caused her death. Consequently, there is no realistic possibility that the jury would have opted to convict Eduardo of criminally negligent homicide had it received an instruction on that offense, and therefore, any error by the trial court was harmless. *See Braughton*, 569 S.W.3d at 617; *Masterson*, 155 S.W.3d at 171; *Saunders*, 913 S.W.2d at 573–74; *see also Rowell v. State*, No. 01-18-00064-CR, 2019 WL 757902, at *3 (Tex. App.—Houston [1st Dist.] Feb. 21, 2019, no pet.) (mem. op., not designated for publication) (finding no harm where the charge did not include instruction on criminally negligent homicide, an intervening lesser-included offense of murder, and concluding that the jury's finding that the appellant intentionally, rather than recklessly, caused the victim's death was a clear indication that it would not have concluded the appellant negligently caused the victim's death). We overrule Eduardo's second issue.

### 2. Self-defense Instruction as Applied to Manslaughter

In his third issue, Eduardo points out that the charge applied the law of self-defense as to the murder charge. However, Eduardo argues that the trial court erred because the jury charge failed to apply the law of self-defense to the lesser-included offense of manslaughter.

Pursuant to article 36.14, the trial court is required to instruct the jury on statutory defenses, affirmative defenses, and justifications when they are raised by the evidence and requested by the defendant. *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007). "A defendant is entitled to an instruction on self-defense if the issue is raised

---

Johnson's death.

23

by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Lee v. State*, 442 S.W.3d 569, 580 (Tex. App.—San Antonio 2014, no pet.) (quoting *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001)). "Raised by the evidence" means "there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that th[e] element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). Defensive issues may be raised by the testimony of any witness. *VanBrackle v. State*, 179 S.W.3d 708, 712–13 (Tex. App.—Austin 2005, no pet.). The Texas Court of Criminal Appeals has held that "if self-defense would justify a person's conduct for the offense of murder, a trial court errs by instructing the jury that self-defense may not justify his conduct in committing lesser-included offenses such as manslaughter or aggravated assault." *Mendez v. State*, 545 S.W.3d 548, 555 (Tex. Crim. App. 2018).

The record demonstrates that Eduardo did not object to the trial court's failure to apply the law of self-defense to the lesser included offense of manslaughter. *See id.* Therefore, Eduardo must show egregious harm to warrant reversal. *See Almanza*, 686 S.W.2d at 171. The State concedes that the trial court erred by failing to include an application paragraph for self-defense as related to the lesser-included charge of manslaughter, but contests Eduardo's assertion that he was egregiously harmed.

To cause egregious harm, the error must affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Almanza*, 686 S.W.2d at 172. We review the entire record to determine if appellant suffered actual, not theoretical, harm. *Id.* at 171. We consider the entire jury charge; the state of the evidence,

24

including the contested issues and the weight of the probative evidence; arguments of counsel; and any other relevant information revealed by the record of the trial as a whole. *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006); *Almanza,* 682 S.W.2d at 171.

Here, the charge applied the law of self-defense to the offense of murder. By convicting Eduardo of murder, the jury impliedly rejected Eduardo's self-defense theory. *See Rogers*, 664 S.W.3d at 850, n.32; *Braughton*, 569 S.W.3d at 611; *Saxton*, 804 S.W.2d at 913–14 (noting that the assessment of defensive evidence is "solely within the jury's province and the jury is free to accept or reject the defensive evidence"). Further, the jury was instructed to consider manslaughter only if it acquitted Eduardo of murder. Accordingly, the conviction for murder nullified "any possible harm that may have derived from the defective [manslaughter] instruction." *Saunders*, 913 S.W.2d at 569; *see also Starks v. State*, 127 S.W.3d 127, 133 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (concluding that although defendant was entitled to self-defense instruction for lesser included offense, error was harmless because jury did not reach issue after convicting defendant on greater offense); *Newton v. State*, No. 05-06-00107-CR, 2008 WL 73535, *2 (Tex. App.—Dallas Jan. 8, 2008 pet. ref'd) (mem. op., not designated for publication) (same); *cf Mendez v. State*, 515 S.W.3d 915, 922–928 (Tex. App.—Houston [1st. Dist.] 2017) (holding the appellant was egregiously harmed where the jury charge applied the law of self-defense to the charged offense of murder but not the lesser-included offense of aggravated assault and the jury acquitted the appellant of murder and found him guilty of aggravated assault), *aff'd*, 545 S.W.3d 548 (Tex. Crim. App. 2018). We overrule Eduardo's third issue.

25

## IV. CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
22nd day of August, 2024.

26